MASUTH v. STATE OF INDIANA.

[No. 29,081. Filed June 16, 1954. Rehearing denied October 4, 1954.]

*Richard W. Mehl,* of *Mehl & Mehl,* of Goshen, for appellant.

*Edwin K. Steers,* Attorney General, and *Frank E. Spencer, Carl M. Franceschini* and *Richard M. Givan,* Deputy Attorneys General, and *Charles E. Hughes,* Prosecuting Attorney, Elkhart County, for appellee.

FLANAGAN, C. J.—For the background of this case, see *Masuth* v. *State* (1952), 231 Ind. 265, 108 N. E. 2d 313.

Upon retrial, the petition for writ of error *coram nobis* was denied. The evidence was conflicting. We cannot weigh the evidence. *Souerdike* v. *State* (1952), 231 Ind. 204, 108 N. E. 2d 136.

Appellant complains that she was not permitted to amend her petition to conform to the evidence. We have stated that the evidence is in conflict and that we cannot weigh the evidence. Whether or not appellant was permitted to amend her petition makes no difference. And, of course, it is fundamental that a petition upon appeal will be considered amended to conform to the evidence.

After denying appellant's motion to amend her petition to conform to the evidence, the court of its own motion set aside the submission and reopened the issues to permit any amendments or new pleadings. No amendments or new pleadings were filed. We are not able to discover whether such action was prejudicial to appellant.

Judgment affirmed.

Bobbitt and Draper, JJ., concur.

Gilkison, J., dissents with opinion in which Emmert, J., concurs.

NOTE.—Reported in 120 N. E. 2d 272.

## DISSENTING OPINION

GILKISON, J.—Dissenting.

I dissent from the majority opinion in this case for the reasons herein stated.

This case is a continuation of *Masuth* v. *State* (1952), 231 Ind. 265, 108 N. E. 2d 313. After the reversal, the cause was again submitted and tried in the Superior Court of Elkhart County on April 6, 1953, without amendment of the pleadings. The case was re-tried wholly by record evidence, being the same as in the former trial, except petitioner's exhibit No. 3, was admitted in evidence agreeable with the opinion in the former appeal. This exhibit is lengthy—consuming twenty-five pages of the record. In our former opinion we gave it as abridged by us. Without re-copying it, I incorporate the abridgment of exhibit No. 3, as found in our former opinion, in this case.

Rose Masuth's liberty for life has been taken without a trial, on a supposed plea of guilty made for her by her pauper attorney, in which plea the prosecuting attorney, the pauper attorney and the judge who accepted the attorney's plea, each took an active part against the defendant and in favor of the state.

In such a situation it is our duty to set aside all technical rules that stand in the way of "due course of law," Art. 1, §§12 and 13, Indiana Constitution, "due process of law," 14th Amendment U. S. Constitution, and the accomplishment of justice. 14 Am. Jur. Courts §§152, 153, 157, pp. 357, 358, 359, 361;

*The United States, Plf. In Er.* v. *Breitling* (1858), 20 How. (U. S.) 252, 264, 15 L. Ed. 900, 901; *Farmer's Bank & Trust Co. Receiver* v. *Brown* (1933), 249 Ky. 820, 61 S. W. 2d 628, 91 A. L. R. 325, 326; *Big Creek Stone Co.* v. *Seward* (1895), 144 Ind. 205, 209, 42 N. E. 464.

Our Appellate Court has succinctly stated the correct rule thus:

> "If a rule shall ever be interpreted or applied to the end that truth be obscured, such fact will be a public misfortune. By a rigid interpretation of these very reasonable rules, it would be possible to preserve the form of judicial consideration and abandon the substance thereof in any given case wherein partiality or interest might operate. Such a state of affairs would be unendurable." *Indiana Union Traction Co.* v. *Heller* (1909), 44 Ind. App. 385, 387, 388, 89 N. E. 419.

It has been well said that,

"The real office of the courts, whether nisi prius or appellate, is the governmental instrumentality through which the subjects of the sovereign may attain exact justice, based solely upon truth. The rules promulgated and used by the courts to arrive at the truth, must not be so closely adhered to that the truth of an action may not be the foundation of the judgment, but the rules must be so elastic, or give way altogether, for the admission of truth upon which all just judgments must be based. *The fundamental principle of our jurisprudence that a final judgment shall forever put at rest the controversy involved in the litigation, must not rest upon fraud practiced upon the court; or falsities instead of, and in preference to realities.*" (My italics). *Partlow* v. *State* (1924), 195 Ind. 164, 144 N. E. 661.

Because of the vast importance of the case I think it is highly improper to determine this appeal by the

trite sheltering statement, "The evidence was conflicting. We cannot weigh the evidence." To do so gives the rule stated a rigidity that is destructive of human liberty. *VanWinkle* v. *VanWinkle* (1954), 124 Ind. App. 626, 119 N. E. 2d 328, 329, and cases there cited.

That the death was caused by mercurial poison is supported by Dr. J. L. Haymond, pathologist, after an autopsy on Masuth's body at 10:00 P.M., December 4, 1945, death having occurred at 6:10 P.M., of the same date, although he said: "There is nothing specific in these anatomical changes for any certain toxin or poison."

The conclusion of the coroner, Dr. S. C. Wagner, after considering all the evidence, including that of Professor Harger, was that "deceased came to his death (from) *mercurial poisoning whether suicidal, accidental or homicidal undetermined.*"

Dr. W. R. Goodrum testified that when Masuth was brought to the hospital on December 4, 1945, he, the doctor, immediately gave the patient an intravenous injection of 1000CC 10% glucose and 1 Amp. salyrgan, in the emergency room of the hospital. It was an emergency situation, and time was an important factor. The patient was semi-conscious, muttering, but no words. He was in a dying condition. It was a matter of taking a one to one thousand chance. "I had a history that he had not passed urine for around three days. I gave salyrgan, a powerful diuretic—probably the most powerful. A person can be so deathly ill that the salyrgan could very easily have tipped the scales the other way. In other words the salyrgan could very easily have tipped the scales for his death."

He further said: " However, phosphorus is one drug that if present in the body, you jolly well know it. It is a distinct odor. Whenever a person is brought in,

either conscious or semi-conscious, as Mr. Masuth was . . . you smell the breath, and if phosphorus is there, you will smell it . . . It was at that time I made a note that there was no odor to the breath. So far as phosphorus is concerned, I think that is completely out of the picture."

Dr. Arthur W. Hull testified he was the family doctor of the Masuth family. Leo Masuth was suffering from syphilis. He treated Leo "lots of times." He was an alcoholic. Syphilis causes a "generalized degeneration." It and alcohol affects the liver and kidneys and may cause such a degeneration that they cease to throw off waste products. There have been many deaths from the use of salyrgan intravenously. It is likely to cause immediate death by ventricular fibrillation; or by acidosis.

From his knowledge of decedent and his examination of evidence at the coroner's inquest and the treatment given, he says, "I think the injection of mercury is what pushed him over." Decedent's condition when brought to the hospital was "of many years duration, because I know from previous examination that while he was in Marion he had a similar attack."

If a person should take phosphorus orally there would be quite an odor that would last a few days. Phosphorus taken orally will burn the mouth, throat and stomach, and these burns would be visible in an autopsy. There were no such burns shown by the autopsy in this case.

The salyrgan given him was the immediate cause of his death.

The findings of Dr. S. C. Wagner, the coroner noted above, was supported by a "report of analyses for poisons" conducted upon organs from the body of Leo Masuth by one R. N. Harger—Professor of Bio-

chemistry and Toxicology Indiana University School of Medicine. He is not an M.D. In this report Professor Harger stated in his conclusion as follows:

"The concentration of mercury which was found in the kidneys is typical of what one finds in cases of fatal mercury poisoning. The concentration of mercury which was found in the liver is a little lower than the average case of fatal mercury poisoning but is consistent with this type of poisoning. The small amount of mercury found in the stomach and the intestines indicates that the deceased had received no mecury by mouth for at least a day prior to his death."

This analytical report was made by Professor Harger in time to be included in the coroner's Autopsy Report dated January 21, 1946.

However on February 16, 1952, more than six years after he made his analytical examination of the organs of Masuth's body upon which he based his report as aforenoted, Professor Harger, executed his affidavit, occupying four pages in the record, which the court, over the objection of the petitioner, allowed to be placed in evidence. In this affidavit the Professor seems to have forgotten his conclusions made more than six years before just after he examined decedent's kidney, stomach and intestines, for he arrived at a different conclusion. He summarized it thus:

Affiant further says in summary that recent studies in our laboratories and in other places have shown that in cases coming to autopsy the kidney may contain even greater amounts of mercury than were found in the case of Leo Masuth, that while the mercury found in decedent's kidney may have contributed to his death it was not the primary cause of death and if it is claimed that decedent's death was due to the administration of a single ampule of salyrgan, I am convinced that

there is not a shred of scientific evidence to support this theory and it is my opinion that the primary cause of the death of Leo Masuth was poisoning from yellow phosphorus."

This affidavit tends to contradict all the other scientific witnesses in the case, including the statement of the affiant, Professor Harger, himself. As I understand the situation this makes the learned Professor a positive witness on both sides of the proposition. That is, on January 21, 1946, after he had examined the organs of Masuth's body he was quite sure that what he found was "typical of what one finds in cases of fatal mercury poisoning." More than six years later, time and we know not what else, caused a great change in the Professor's opinion for he says "that while the mercury found in decedent's kidney may have contributed to his death, it was not the primary cause of death." As I view this situation the only effect the delayed affidavit of the Professor can have is to neutralize his evidence, in other words, the facts should be determined as though Professor Harger had not given evidence at all.

I have given the substance of the evidence heard on the cause of death of decedent because it must be conceded that if he died from mercurial poison or causes other than phosphorus poison, petitioner could not be guilty of his murder. If he died from phosphorus poison she could be guilty. From the facts noted there was no evidence that he died from phosphorus poison. There is an abundance of evidence that he died from mercurial poison.

After the evidence was heard, appellant filed a motion to amend the Second Amended Petition upon which the trial was had, to make it conform to the evidence. The motion is long and repetitious, but

it seeks to make additional averments in the petition as follows: (1) That at the time the plea of guilty was entered for the petitioner she was insane. (2) That at the time the plea of guilty was entered for petitioner, she was not represented by competent counsel. (3) That when the plea of guilty was entered for petitioner, she did not have sufficient intelligence to fully and understandingly enter a plea of guilty to murder. (4) That because of her mental condition petitioner could not understand what her constitutional rights were and therefore could not waive these rights.

This motion to amend the amended petition was overruled. I think this ruling was reversible error. The court then *sua sponte* set aside the submission of the cause, re-opened the issues and granted to and including May 14, 1953, for petitioner to file additional pleadings. This action of the court did not and could not alleviate, void or nullify the reversible error already committed. On May 5, 1953, petitioner's attorney refused to plead further. The cause was then re-submitted for trial. The parties agreed that the evidence theretofore heard should be the evidence in the case.

Upon this evidence the court denied appellant's petition and rendered judgment accordingly, on the apparent theory that no question of a violation of appellant's constitutional rights at and prior to her arraignment was presented, from which this appeal is taken.

Our decision in this case on the former appeal remains the law of the case through all its subsequent stages and must be adhered to, in the trial court and in this court on this or any subsequent appeal. *Todd* v. *State* (1951), 229 Ind. 664, 688, 690, 101 N. E. 2d 45 and many authorities there cited. In the former appeal we said: (231 Ind. 265, at page 271)

> "The petition . . . is essentially a petition to vacate the judgment, to be permitted to withdraw the plea of guilty, to enter a plea of not guilty, and to have a trial upon the indictment. The court . . . had jurisdiction to receive and act upon the application, to set aside the judgment, permit the withdrawal of the plea of guilty and enter a plea of not guilty which is a recognized procedure in this state." (Page 271). We also said, "After trial, this court will presume the amendment of the complaint or petition to conform to the facts proved, where the amendment will not deprive a party of any substantial right." (page 272).

The majority opinion states correctly, "And of course, it is fundamental that a petition upon appeal will be considered amended to conform to the evidence." So with this legal proposition admitted and in view of the law of the case, we must presume the petition to be amended to charge the denial of defendant's constitutional rights at the time of her arraignment and plea, and that it asks to vacate the judgment, to withdraw the plea of guilty and to enter a plea of not guilty.

There is no conflict in the evidence as to what transpired at and prior to the time the plea of guilty was entered by the pauper attorney. Petitioner's exhibit No. 3, heretofore noted, indicates that an honorable member of the Indiana bar, who in the earlier stages of the case had acted as appellant's attorney, the late Robert E. Proctor, informed the trial court three days before it took the plea of guilty, that the petitioner was so afflicted with syphilis and her brain was so affected thereby, that she did not know what she was doing. He further told the court "I think it should go before a jury. She should be defended. That is my attitude. I don't think it is safe for the court to take a plea."

The pauper attorney appointed by the court to defend petitioner, seems to have done nothing for her, but on the contrary he actively served the state. He brought petitioner into court at the request of the prosecuting attorney. He permitted the prosecuting attorney to question her in jail and get her consent to change her plea of not guilty to a plea of guilty of second degree murder, though she said she wasn't guilty. He had the prosecutor question the petitioner and then had the judge question her. In quite a long talk the judge told her there was no such thing as pleading guilty and then saying you are not guilty. When asked if she understood all that she answered: "I think I do." After quite an admonishment the judge asked why she wanted to plead guilty and get a life sentence? She answered: "I don't know for sure." The pauper attorney then told the court that the sheriff said his client wanted to plead guilty. He then asked her two questions which very clearly indicate the nature of professional service he was giving her, thus: "Q. Was it your desire to enter a plea of guilty to second degree murder this morning? A. Yes. Q. And you are guilty of second degree murder? A. Yes."

It was the pauper attorney who confessed her guilt by his leading questions, not the petitioner. It was this situation that prompted the statement from Honorable Robert E. Proctor noted above. However, three days later the pauper attorney appeared in court with the petitioner for the sole purpose of pleading her guilty. He asked to offer evidence, which he and the trial judge permitted the prosecutor to introduce, consisting of apparent confessions of his client and which were identified as State's Exhibits A, B and C, all taken by the prosecutor, and the police. They also introduced the evidence taken at the coroner's inquest, and

526

state's Exhibit E, which was prepared by the pauper attorney and was another confession, and a pretended authorization for the pauper attorney to plead guilty for her, to murder in the second degree. In it was the remarkable statement and agreement that she would save the pauper attorney harmless from any action or causes of action that she might have or might acquire by reason of the fact that he enter a plea of guilty for her.[1] He also put in his own voluntary statement that a doctor had told him by telephone that petitioner was of sound mind—not insane, and that she could understand "questions that might be put to her in the simplest of language."

I do not think petitioner was represented at all by the pauper attorney. He seems to have been wholly under the influence of the state, the sheriff and the police, and was just one more factor powerfully coerc-

---

1. This remarkable confession, omitting caption and signature is as follows:

"The undersigned, Rose Masuth, hereby states that on the 1st day of December, 1945, and again on the 2nd day of December, 1945, at the County of Elkhart in the State of Indiana, I purposely and unlawfully killed and murdered my husband, Leo Masuth, by administering to him a deadly poison called mercury and phosphorous which was contained in a certain quantity of rat poison and which was swallowed by my husband, Leo Masuth, in a peanut butter sandwich into which the said rat poison was mixed as fully set forth in a certain indictment filed in the Elkhart Superior Court on the 5th day of March, 1946, being Cause No. 2103. That I have had fully explained to me the various degrees of murder namely, Murder in the First Degree, Murder in the Second Degree and Manslaughter, and the penalties therefor.

I am in full control of my mental faculties. I am of sound mind and fully aware of the meaning of the aforesaid statement. Nothing has been paid as compensation to Mr. Eichelberg to represent me. I now hereby instruct my attorney to enter for me and in my presence a plea of Guilty to Second Degree Murder, and I save my attorney, Frank C. Eichelberg, harmless from any action or causes of actions that I may have or acquire by reason of the fact that he enters a plea of guilty for me, and which plea is with my full knowledge and consent.

Dated this 15th day of May, 1946.

Rose Masuth."

ing petitioner to plead guilty. Petitioner would have been better off without an attorney than with the pauper attorney provided for her by the court.

We have recently held:

"A valid plea of guilty in a court having jurisdiction of the offense is a judicial confession of guilt. *Batchelor* v. *State* (1920), 189 Ind. 69, 125 N. E. 773. It admits the incriminating facts alleged. C. J. S., Criminal Law, §424. It should be *cautiously* received. It should not be accepted from one who does not know, or who, at the time of arraignment, asserts that he does not know, whether or not he has committed the crime charged, for such would be entirely incompatible with an admission of guilt, and wholly inconsistent with the due administration of justice.

"As we view it, a plea of guilty tendered by one who in the same breath protests his innocence, or declares he actually does not know whether or not he is guitly, is no plea at all. Certainly it is not a sufficient plea upon which to base a judgment of conviction . . ." *Harshman* v. *State* (1953), 232 Ind. 618, 115 N. E. 2d 501, 502.

The minimum duties of an attorney are set out in §4-3608, Burns' 1946 Repl. Among these duties we find the following:

"Fifth to maintain inviolate the confidence, and at every peril to himself, to preserve the secrets of his client."

It has been correctly stated that:

"Statements made by a client to his legal adviser are privileged though no action is at the time pending or contemplated concerning the matter of which such statement is made, if it appears that the relation of attorney and client exists, and that the statement was made to him in his professional character, with a view to legal advice, which, as an attorney it was his duty to give.

"The client, as well as the attorney, is protected, and neither can be required to disclose what oc-

curred between them." Works Indiana Practice, Pleading and Forms, Vol. 2, §1216, p. 268. Watson's Works Practice, Vol. 2, §1473, p. 91. Lowe's Revision Works' Indiana Practice, Vol. 3, §48.7, Indiana Trial & Practice,—Flanagan, Wiltrout, Hamilton, §1892, p. 429, 432. *Fluty* v. *State* (1947), 224 Ind. 652, 656, 657, 71 N. E. 2d 565, and authorities there cited.

It was the imperative duty of the pauper attorney to refuse to testify against his client as to matters communicated to him as her attorney and if he attempted to violate that duty it was the imperative duty of the judge to refuse to hear him.

Our court has recently held:

"The guilt or innocence of an accused does not determine whether or not he should plead guilty or stand trial. He is entitled to be advised as to all his legal rights involved under the law and the facts, and even though guilty he has the right to require the state to prove every material allegation of the offense charged. He has the right to expect that his court-appointed counsel will make such investigation of the facts as the circumstances require. . . . An accused has the right to elect as to whether he will stand trial or plead guilty. If he elects to stand trial his counsel should vigorously present every legal defense and represent him with his utmost skill and ability."

"Anything short of this is not adequate, competent or effective representation by counsel which the Constitution commands shall be afforded. . . ."

"The right to be heard by counsel provided by §13 of Article 1, of the Constitution of Indiana, as well as the due process clause of the Fourteenth Amendment cannot be nullified by the appointment of incompetent counsel who give merely perfuntory or casual representation." *Abraham* v. *State* (1950), 228 Ind. 179, 184, 185, 91 N. E. 2d 358, and authorities there cited.

The Supreme Court of the United States has nicely stated the duty of a pauper attorney thus:

" . . . Undivided allegiance and faithful devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision. And nowhere is this service deemed more honorable than in case of appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular group, or may be charged with an offense which is peculiarly abhorrent." *Von Moltke* v. *Gillies* (1948), 332 U. S. 708, 725, 92 L. Ed. 309, 322; *Glasser* v. *United States* (1942), 315 U. S. 60, 70, 86 L. Ed. 680, 699.

It is our duty as well as that of the trial court to see that appellant's constitutional rights are not improperly denied. *Kuhn* v. *State* (1943), 222 Ind. 179, 187, 193, 52 N. E. 2d 491; *Wilson* v. *State* (1943), 222 Ind. 63, 78, 51 N. E. 2d 848; *Sweet* v. *State* (1954), 233 Ind. 160, 117 N. E. 2d 745.

The question of the guilt or innocence of a defendant is not before the court in a *coram nobis* petition where constitutional rights are violated. *State* v. *Lindsey* (1952), 231 Ind. 126, 134, 106 N. E. 2d 230; *Beard* v. *State* (1949), 227 Ind. 717, 723, 88 N. E. 2d 769; *Batchelor* v. *State* (1920), 189 Ind. 69, 84, 125 N. E. 773.

The court was without power to hear evidence on the subject of the guilt or innocence of the petitioner to determine whether he should accept the plea of guilty offered by her pauper attorney. The evidence was self-incriminating in character and could not have been voluntarily given by petitioner. It was taken when she was in jail in the hands of the police officers of the state. She had the pauper attorney, but the evidence indicates he did not advise her but assisted the state in securing confessions from her, one of which, secured by him, he put in evidence in the questionable hearing held by the judge at the request of the pauper attorney.

"It has been frequently held that incriminating evidence elicited from an accused person under such circumstances is not voluntarily given." The evidence was not properly before the court for any purpose, because it was obtained by a violation of rights guaranteed to defendant by the constitution. Art. I, Sec. 14, Indiana Constitution. *Batchelor* v. *State* (1920), 189 Ind. 69, 82, 83, *supra,* and authorities there cited.

After the unlawful procedure noted, the judge gave the defendant advice or command, as follows:

"I read over the evidence in this case, Mrs. Masuth, and I think from what I understood of the facts here presented to me, that is what I wanted to know; what the facts were, and the confessions by you, so that there is no question about your guilt, either of first degree or second degree murder, and you have put in your plea of second degree murder, which I will accept. What is your age?"

For the many reasons noted, I think appellant's constitutional rights were violated at and prior to the time the pauper attorney pleaded her guilty. I think the record conclusively shows she has not had due process of law or due course of law agreeable with the 14th Amendment, or the Constitution of Indiana.

The judgment of the trial court should be reversed with instructions to find for the petitioner, to vacate the judgment rendered in the Elkhart Superior Court on May 16, 1946, against appellant in criminal cause No. 2103, entitled *State of Indiana* v. *Rose Masuth, Leslie B. Marjason;* to permit the withdrawal of the plea of guilty entered therein for her by the pauper attorney; to accept a plea of not guilty therein; and for further proceedings agreeable with this opinion.

Emmert, J., concurring.

NOTE.—Reported in 120 N. E. 2d 272.