Tyrone FORD, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 3–482A86.

Court of Appeals of Indiana, Third District.

Aug. 30, 1982.

---

Ray L. Szarmach, East Chicago, for appellant.

Linley E. Pearson, Atty. Gen., Aimee L. Kolze, Deputy Atty. Gen., Indianapolis, for appellee.

STATON, Judge.

After a jury trial, Tyrone Ford was found guilty of two counts of voluntary manslaughter, a class B felony.[1] He received two consecutive 10 year sentences.

On appeal,[2] Ford raises the following issues: [3]

1. "[IC] 35–42–1–3. Voluntary manslaughter.—(a) A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a class B felony.

"(b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under section 1(1) [35–42–1–1(1)] of this chapter to voluntary manslaughter. [IC 35–42–1–3, as added by Acts 1976, P.L. 148, § 2, p. 718; 1977, P.L. 340, § 27, p. 1533.]"

2. Ford apparently believed that our Supreme Court had jurisdiction of this case. Jurisdiction is determined by reference to the term of each sentence imposed without regard to whether or not any terms may be served consecutively. *Garrett v. State* (1980), Ind.App. 415 N.E.2d 720, 721. The minimum sentence Ford received is not greater than ten years; therefore, jurisdiction lies with the Court of Appeals.

3. The issues have been reworded and reordered.

(1) Did the trial court err when it did not suppress his confession to the police?

(2) Was his conviction as a matter of law supported by sufficient evidence?

(3) Did the trial court err when it refused his tendered instructions on involuntary manslaughter and reckless homicide?

We affirm.

## I.

### Confession

When Ford was arrested he was given his *Miranda* rights. The *Miranda* rights were also read to him from a printed form when he was at the police station. Officer Herma, having been informed that Ford had been advised of his rights, had the following conversation with Ford:

"A.  I told him I had his gun, also the shells. It was better for him to tell the truth. He might as well get it off his chest. There wasn't anything he could do about it, what happened is what happened; nothing he could do about it now.

"Q.  [the Prosecutor] Did he make any response to you?

"A.  He looked at me and then he said, 'Can I talk to you?' I said, 'Well, just a minute.' At which time the door of the conference room was open. I called for Lt. Brown. He was in the hallway. He came into the room. I told him Tyrone Ford would like to speak to me, and at this time Tyrone Ford said, 'I'll talk to him too.'"

Ford then confessed.

On appeal, Ford argues that his confession was not voluntary. He argues that the statements by Officer Herma were made with the intent to deceive and trick him to give a confession by implying that he did not need counsel and that giving a confession would not be damaging because nothing could be done for Ford; therefore, the trial court erred when it did not suppress his confession. We disagree.

■  The admissibility of a confession is controlled by determining from the totality of circumstances whether or not the confession was given voluntarily and not through inducements, violence, threats or other improper influences so as to overcome the free will of the accused. *Smith v. State* (1982), Ind., 432 N.E.2d 1363, 1369. The trial court determines if the confession was voluntarily given. We review the question on appeal as we do other sufficiency matters; we do not weigh the evidence. We determine if there was substantial evidence of probative value to support the finding of the trial court. *Id.*

Our Supreme Court has consistently held that vague and indefinite statements by the police such as "seeing what they could do for him" or it would "be in his best interest to tell the real story" are not sufficient inducements to render a subsequent confession inadmissible. *Id.* Nor will confronting an accused with incriminating evidence amount to coercion or render a resulting confession inadmissible. *Ward v. State* (1980), Ind.App., 408 N.E.2d 140, 143.

■  There is sufficient evidence of probative value to support the determination of the trial court that Ford's confession was voluntarily given. The trial court did not err in admitting Ford's statements.

## II.

### Sufficiency of Evidence

Ford argues that there is not substantial evidence of probative value from which the jury could reasonably infer that he was guilty beyond a reasonable doubt.

■  When evidence to support a conviction is reviewed on appeal, we do not reweigh the evidence or assess the credibility of witnesses. We only consider that evidence most favorable to the State and all

reasonable inferences drawn therefrom. We will not disturb the verdict if there is substantial evidence of probative value to support each element of the offense. *Hall v. State* (1980), Ind., 405 N.E.2d 530, 535.

■ Ford has failed to state in his argument what element of the crime for which he was convicted is not supported by sufficient evidence. He has waived this error. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7). However, we note that his conviction is sufficiently supported by his confession. Officer Herma stated:

> "Tyrone Ford told me that he had been by Stacey's house earlier and that Stacey had threatened him with a gun. He left that location, went home, got his gun and came back to 16th and Connecticut. That Stacey and his girlfriend were both there sitting on a car. That Stacey's woman threatened him, told him that if she caught him in her gangway again she would kill him. He said he didn't know if Stacey still had his gun with him. He says he pulled out his gun and shot them both and ran away."

### III.

#### Instructions

Ford tendered instructions on involuntary manslaughter and on reckless homicide. The trial court refused to give these instructions. On appeal, Ford argues that the trial court erred when it refused his tendered instructions because the jury was entitled to be instructed on the lesser included offenses.

The test for determining the propriety of giving an instruction upon the lesser included offense was delineated by this Court in *Roddy v. State* (1979), Ind.App., 394 N.E.2d 1098. A two-step methodology was developed to determine whether a defendant may properly be convicted of a lesser offense.[4] The first step is designed to determine whether the lesser offense is "included" within the crime charged. That deter-

mination is made by examining the elements set forth by statute of the greater and lesser offenses, together with the factual allegations contained in the charging instrument. From this examination, the court determines whether a conviction of the greater offense, as it is charged in the indictment or information, requires proof of all essential elements of the lesser offense, plus an additional element which distinguishes the two offenses. *Id.* at 1104. If it is determined that the lesser offense is "included" within the greater crime charged, step two is triggered.

■ The second step of the methodology has been explained by this Court as follows:

> "Step two of the *Lawrence* [*v. State* (1978), 268 Ind. 330, 375 N.E.2d 208] inquiry is designed to insure that the final instructions which are given to the jury conform to the issues and evidence before it. *Harris v. State* (1977), Ind., 366 N.E.2d 186, 188. To guard against a violation of this longstanding principle, the trial court examines that evidence which tends to prove or disprove the commission of the elements which compose the greater and lesser included offenses. Based on its examination, the trial court should instruct the jury on the lesser included offense only when it finds that there is 'evidence of probative value from which the jury could properly find the defendant guilty of such lesser included offense.' *Lawrence v. State, supra* [375 N.E.2d], at 213, *quoting Hash v. State* (1972), 258 Ind. 692, 698, 284 N.E.2d 770, 774 (DeBruler, J., dissenting)."

*Id.* However, the trial court's duty to give an instruction upon a lesser included offense is not triggered automatically by the admission of evidence that indicates the lesser offense was committed. The trial court must engage in additional inquiry:

> "A trial court should not give an instruction and form of verdict on a lesser included offense simply because the evidence indicates that the defendant com-

---

4. The Indiana Supreme Court cited *Roddy* with approval and specifically applied its two-step methodology in *Swafford v. State* (1981), Ind.,

421 N.E.2d 596, 603; *see also, Goodpaster v. State* (1980), Ind., 402 N.E.2d 1239, 1242–44.

mitted the lesser offense in the process of the acts for which he or she was charged.

"To be sure, the evidence must establish the commission of the elements which comprise the lesser included offense in order for an instruction and form of verdict on that offense to go to the jury. However, the major focus of the evidentiary test is not on the elements of the lesser offense, but rather on the element(s) which distinguish(es) the offense charged from the lesser included offense. If the evidence which indicates that the defendant did in fact commit the distinguishing element is uncontroverted, then the instruction on the lesser included offense should not be given to the jury. If, however, as the Court stated in *Lawrence*, evidence of probative value raises a 'serious dispute' regarding whether the defendant in fact committed the distinguishing element(s), an instruction and form of verdict on the lesser included offense should be given to the jury. *Lawrence v. State, supra* [375 N.E.2d], at 213."

*Id.*, at 1111.

Involuntary manslaughter, IC 35–42–1–4, is defined as follows:

"35–42–1–4. Involuntary manslaughter.—A person who kills another human being while committing or attempting to commit:

(1) A class C or class D felony that inherently poses a risk of serious bodily injury;

(2) A class A misdemeanor that inherently poses a risk of serious bodily injury; or

(3) Battery;

commits involuntary manslaughter, a class C felony. However, if the killing results from the operation of a vehicle, the offense is a class D felony. [IC 35–42–1–4, as added by Acts 1976, P.L. 148, § 2, p. 718; 1977, P.L. 340, § 28, p. 1533.]"

Reckless homicide, IC 35–42–1–5, is defined as follows:

"35–42–1–5. Reckless homicide.—A person who recklessly kills another human being commits reckless homicide, a class C felony. [IC 35–42–1–5, as added by Acts 1976, P.L. 148, § 2, 1977, P.L. 340, § 29; 1980, P.L. 83, § 6.]"

Recklessly is defined as follows in IC 35–41–2–2(c):

"A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct."

■ As was noted in footnote one, voluntary manslaughter requires a person to knowingly or intentionally kill another human being while acting under sudden heat. These terms are defined in IC 35–41–2–2 as follows:

"35–41–2–2. Culpability.—(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so.

"(b) A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."

After comparing the above definitions, we conclude that it is possible for reckless homicide and involuntary manslaughter to be lesser included offenses of voluntary manslaughter. The element which distinguishes voluntary manslaughter from the lesser included offenses of involuntary manslaughter and reckless homicide is the requirement of the specific intent of knowingly or intentionally killing another human being. We must determine if the evidence which indicates that Ford did in fact have the specific intent is uncontroverted. If it was, then the instructions on the lesser included offenses should not have been given. If there is evidence of probative value from which the jury could properly find Ford guilty of the lesser included offenses, then they should be given to the jury.

■ Ford's written confession was before the trial court. It states as follows:

"GARY POLICE DEPARTMENT        CASE # . . . . . . . . . . . . . . . . . . .
GARY, LAKE COUNTY, INDIANA    DATE: . . . . . May 26, 1981 . . . . .
INVESTIGATIVE DIVISION       TIME: . . . . . 1:45 AM . . . . . . . .

This is a statement made by Tyrone Ford, M–B in the Investigative Division of the Gary Police Department, Gary, Indiana. Statement made at (time) 1:45 AM on (date) May 26, 1981. Questions asked by Lt. W. Brown & Cpl. R. Fleming and typed by Lt. W. Brown.

---

Q. What is your true name, age, address, and telephone number?
A. Tyrone Ford, 22 yrs old, 1806 E. 20th Ct.

Q. Where and when were you born?
A. Gary, Ind. 4–24–59

Q. Are you married or single, and if married, do you have any dependent children?
A. Single, one child.

Q. Can you read and write the English language?
A. Yes.

Q. How much education have you had?
A. 11th Grade

Q. What is your occupation?
A. Unemployed.

Q. Have you been advised of your Civil Rights?
A. Yes.

Q. Do you realize that this statement may be used in case of a trial?
A. Yes.

Q. Why are you here in the Investigative Division of the Gary Police Department at this time?
A. For shooting somebody.

Q. Would you please tell me, in your own words, just what happened on May 25, 1981 at appx. 10:45 PM, at the corner of 16th & Conn. St.
A. I had parked my car at 15th & Mass. I walked over to corner of 16th & Conn. St., I was talking to the fellow and his wife said If you walk through the gangway again like that I will kill you, she had said that eairler [sic] when I was there, she said it again. After she said it the second time I was already scared, that is when I shot them.

Q. What were you talking about to the fellow?
A. Money he owed me, that he said that he would pay me.

Q. Had you been there earlier and talked to him about the money?
A. Yes, that is when he pulled a gun on me.

Q. Why did he pull a gun on you the first time you were there?
A. I guess because I ask [sic] him about my money.

Q. When was the first time that you were there?
A. One time I rode through there, he stopped me, he said I'll have it later on this evening.

Q. When was the time when he pulled the gun?
A. About an hour.

Q. When you shot them did you see a weapon?
A. No, but I knew that he had had one.

Q. Did the woman have a weapon at any time?
A. No not that I knew of but she had threaten [sic] to kill me.

Q. How many times did you fire?
A. I am not sure.

Q. How many time [*sic*] did you fire at the man, at the woman?
A. 1 or 2 at each of them.

Q. Can you tell us were [*sic*] you unloaded the weapon? The spent rounds?
A. In the alley between Conn. & Mass. St. the 1600 block.

Q. Were [*sic*] did you reload the weapon?
A. In the alley right off broadway [*sic*], in the 1500 blk, next to were [*sic*] I was arrested.

Q. What did you do with the weapon?
A. I threw it away, in the alley were [*sic*] I was arrested.

Q. Is the weapon that I showed you the weapon that you used?
A. Yes.

Q. Were [*sic*] did you obtain the weapon?
A. I got it on the street.

Q. How much money did the fellow owe you?
A. $200.00

Q. How long ago did you loan him the money?
A. It was in the first of April.

Q. Why did youl [*sic*] loan him the money?
A. He was going to have something done to his car.

Q. Did you have a weapon the time before when you talked to him?
A. No.

Q. Were [*sic*] did you go to get the weapon?
A. Home.

Q. How long did that take?
A. 10 or 15 mins.

Q. How many extra rounds did you have besides the one in the weapon?
A. 5 or 6.

Q. How far were you from the man when you fired?
A. 6 or 7 ft.

Q. Was he facing you when you fired?
A. Facing me.

Q. How far was the woman when you fired, far from you?
A. About the same distance.

Q. Was she facing you or had she turned?
A. She had turned, like sideways.

Q. Can you describe the man?
A. Kind of tall, slim, dark compl, sideburns, he [*sic*] teeth were kind of messed up, male − black.

Q. Can you describe the woman?
A. Female, white, in her 40's, she was shorter than he was.

Q. Describe the weapon?
A. 38 Cal. revolver, black with brown handles.

Q. Did you intend to kill them?
A. No, that really was'nt [*sic*] my intention, after she said something about kill [*sic*] me again, that is what triggered me off.

Q. Can you describe the lighting at the time of the shooting?
A. It was dark.

Q. Were [*sic*] did you have the weapon?
A. It was in my coat pocket, my left pocket, I put in my right hand. [*sic*]

Q. How long had you know [*sic*] them?
A. About a year of [*sic*] two.

Q. Had you ever loaned him money before?
A. Yes, a couple of dollars, he paid me.

Q. Were you friends, did you run around together?
A. Not every day, we drank some together.

Q. When you fired at him did you intend to hit him, her?
A. No, not really he took a step toward me, I don'nt [*sic*] really know.

Q. What were the [*sic*] doing when you approached them?
A. The [*sic*] were leaning against the car, the parked car.

Q. Why did you walk over there the second time instead of driving?
A. I wanted him to see me, If I drove my car I don'nt [*sic*] know what he would have done.

Q. Did you know your car?
A. Yes.

Q. Is there anything else that you would like to add to this statement?
A. I was scared for awhile, when he pulled the gun the other time that I was there.

Q. Have these officer[s] treated you fair?
A. Yes.

Q. Did all this happen in the City of Gary, County of Lake, Ind.?
A. Yes.

Q. Were you drunk of [*sic*] sober at the time of the incident, this incident?
A. I was high. I am sober now and during the giving of this statement.

I certify that I have made and read the foregoing statement constsiting [*sic*] of pages, four. That I make this statement of my own free will and accord without any threats, fear, intimidation or promise of reward fully realizing that the same maybe used in a court of law and that I make this statement to the best of my knowledge and belief and that this statement is true and corredt [*sic*]."

| Witnesse [*sic*] | Ronald B. Fleming | Signed | Tyrone Ford |
|---|---|---|---|
| Witnesse [*sic*] | Wayne Brown | Date | 5–26–81 |
| | | Time | 3:00 AM " |

---

This evidence does not support the giving of Ford's tendered instructions. Ford had not returned with the intention to kill the decedents; however, the woman "triggered me [Ford] off" when she repeated something about killing him.

Judgment affirmed.

HOFFMAN, P. J., concurs.

GARRARD, J., concurs in result.