Keith Allen ELLIOTT, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 4–1081A160.

Court of Appeals of Indiana,
Fourth District.

July 7, 1983.
Rehearing Denied Aug. 23, 1983.

David M. Hamacher and Elizabeth H. Hamacher, Hamacher & Hamacher, Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., Carmen L. Quintana, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Judge.

Keith Allen Elliott is appealing his conviction for involuntary manslaughter for his involvement in his girlfriend Sheryl Wilson's shooting death. Ind.Code 35–42–1–4 (class C felony). Elliott asserts he is enti-

tled to reversal, citing various errors at trial and insufficiency of the evidence. We are unpersuaded by Elliott's arguments and affirm his conviction.

## ISSUES

Elliott has formulated the following issues for our review:

1. whether the verdict of the jury was supported by sufficient evidence,
2. whether the trial court erred in instructing the jury on involuntary manslaughter as a lesser included offense of voluntary manslaughter, and
3. whether the trial court committed fundamental error by:
   a. allowing the prosecutor to engage in unethical and inflammatory tactics,
   b. giving an instruction on involuntary manslaughter which failed to inform the jury of an essential element of the crime,
   c. allowing the conviction to stand where the indictment did not sufficiently inform Elliott of a potential charge for involuntary manslaughter,
   d. allowing Elliott's statements into evidence, or
   e. the combination of two or more of the above alleged errors.

## FACTS

On the evening of December 24, 1979, Joseph Slay, a Gary police officer, was working as a security guard for Gary Mercy Hospital when Elliott entered the emergency room and informed him that Sheryl Wilson, Elliott's girlfriend, had been shot and was out in the car. Slay went to the automobile and found Sheryl lying across the bucket seat on the passenger side. In removing her from the car Slay detected no signs of life but noticed the blood flowing from her head area was warm enough to form a mist when exposed to the cold air. At this time Elliott had blood splattered all over his clothing and scratches on his nose, chin, hands, and arms. While there is evidence that he had had these scratches for several days, there is also testimony that

some of the scratches were "fresh" or "bloody."

The coroner who examined Sheryl's body determined she died as the result of a bullet fired at close range which severed the carotid artery in her neck. It was determined the bullet entered the left side of the neck and exited on the right side. It was also determined death would have occurred within minutes after the infliction of the wound.

Elliott volunteered a statement to Officer Slay, repeated to others, that he and Sheryl had been driving on Broadway in Gary when a white vehicle drove up next to them and two negroes shot Sheryl. An examination of Elliott's vehicle revealed both windows were rolled up with no bullet holes in them. Based upon the inconsistencies between Elliott's statements and the physical evidence, Elliott was arrested.

Two days following the incident, members of Sheryl's family went to her house and discovered blood on the porch, the front door and the padlock locking that door. They broke into the house and subsequently called the police. Laura Langel, one of Sheryl's sisters, testified that in the living room there was a mattress on the floor, a sleeping bag, a suitcase, and other items, including jewelry, strewn all around the room. There was blood all over the mattress, sleeping bag, floor and carpet. In addition, there was a trail of blood which led out the front door, across the porch and down the sidewalk.

Following the police's examination of the premises, an officer told Elliott of their findings. Elliott then admitted that he was with Sheryl at her house when the shooting took place. He explained that she had been "shooting speed" and he was "taking pills." Sheryl then became depressed, took a gun, and put it to her throat. At this point Elliott stated that a struggle ensued and the gun went off. Elliott also indicated that he tossed the gun out of the car window while en route to the hospital.

A search of the general area where Elliott claimed to have tossed the gun failed to produce the weapon. Laboratory analysis of blood samples taken from Sheryl revealed that no alcohol, narcotics, or other dangerous drugs, including "speed," were present in the blood. It was also disclosed that Sheryl was right-handed. Fingernail clippings taken from Sheryl's body and examined by a forensic serologist showed the presence of human blood, but the examiner could not determine the blood type. The examiner stated that the blood was found at the tip of the nail and in the middle but could not recall whether it was on the exterior or interior portion of the fingernail. Gunshot residue tests were performed on both Elliott and Sheryl, neither test positively demonstrating either individual had fired a weapon.

During closing argument, the prosecutor made several statements with which Elliott takes issue on appeal. Without evidence in the record to support his contentions, the prosecutor surmised Elliott had no gunshot residue on his hands because he had had ample opportunity to clean up. He also drew unfavorable inferences, based on dramatic interpretations of the evidence, that Elliott and Sheryl had been fighting because of the presence of blood on her fingernails, her freshly mutilated ear, fresh bruises on her arms, the disarray in Sheryl's home, and Elliott's scratches. Lastly, the prosecutor told the jury the State could have charged Elliott with murder but had chosen not to.

The jury found Elliott guilty of involuntary manslaughter, killing Sheryl while committing battery, and the court sentenced him to seven years. He now appeals.

## DECISION

*Sufficiency of the Evidence*

■ Elliott asserts his conviction is not supported by sufficient evidence. Although he recognizes circumstantial evidence can form the basis for a criminal conviction, he contends that where all the evidence is totally circumstantial it must exclude every other reasonable hypothesis. This claim was recently rejected in *Kizer v. State*,

(1982) Ind., 437 N.E.2d 466, where Justice DeBruler stated:

"This claim confuses the law which governs trial courts with that which governs the scope of appellate review. A defendant is entitled to an instruction to the jury that in order to convict on the basis of circumstantial evidence it must find that the evidence excludes every reasonable hypothesis of innocence beyond a reasonable doubt. *Spears v. State,* (1980) Ind., 401 N.E.2d 331. On appeal, however, an appellate court does not use the test of exclusion of every reasonable hypothesis of innocence as the standard for review of sufficiency claims.

" 'Where the evidence of guilt is essentially circumstantial the question for the reviewing court is whether reasonable minds could reach the inferences drawn by the jury; if so, there is sufficient evidence. *Bruce v. State,* (1978) Ind. [268 Ind. 180], 375 N.E.2d 1042, 1080.' "

*Kizer v. State, supra,* at 467.

Elliott's attack on the sufficiency of the evidence is based upon his reliance on favorable inferences that could have been drawn from the evidence or lack thereof. This is essentially a request that we reweigh the evidence which we cannot do. We can only look to see if the inferences drawn by the jury are reasonable. The evidence as set out above would allow a jury to reasonably infer Elliott killed Sheryl.

Several pieces of evidence tend to support this conclusion. First, Elliott fabricated at least one story to explain Sheryl's death. Second, he disposed of the weapon from which the fatal shot was fired. Contrary to Elliott's assertion, there were no drugs found in Sheryl's blood. Finally, it would be highly unlikely that Sheryl, a right-handed person, would commit suicide by shooting herself in the left side of the neck. Thus, the jury could have reasonably inferred that Elliott shot Sheryl. The evidence is sufficient to support his conviction.

*Instruction on Involuntary Manslaughter*

■ Elliott next argues the trial court erred in giving an instruction on involuntary manslaughter, claiming it is not a lesser included offense of voluntary manslaughter. The record, however, reveals Elliott failed to object to the giving of such instruction. Such failure waives any error. Ind.Rules of Procedure, Criminal Rule 8(B); *Henson v. State,* (1982) Ind., 436 N.E.2d 79; *Loza v. State,* (1975) 263 Ind. 124, 325 N.E.2d 173 (lesser included offense instruction).

*Allegations of Fundamental Error*

■ Elliott next raises several alleged errors which he contends are "fundamental errors." The fundamental error doctrine is crucial to this appeal because the errors which follow were never properly objected to at trial. And as this court has stated, "the 'fundamental error' doctrine permits a reviewing court to consider the merits of an improperly raised error if the reviewing court finds that 'the record reveals error so prejudicial to the rights of the Appellant that he could not have had a fair trial.' " *Winston v. State,* (1975) 165 Ind.App. 369, 373, 332 N.E.2d 229, 231. Our supreme court has also further defined fundamental error in a recent case:

" 'To be categorized as fundamental error and thus to transcend our procedural requirements, the error must be blatant, and the potential for harm must be substantial and appear clearly and prospectively.' *See also, Johnson v. State,* (1979) Ind. [271 Ind. 145], 390 N.E.2d 1005,.1010 ('[T]he error complained of must be such, that if not rectified, would deny the defendant "fundamental due process." '); *Young v. State,* (1967) 249 Ind. 286, 231 N.E.2d 797, 799 (fundamental error is one that 'offends our concepts of criminal justice.'); *Wilson v. State,* (1943) 222 Ind. 63, 83, 51 N.E.2d 848, 856 (fundamental error occurs when 'so-called trial did not meet the requirements of due process of law . . . .')."

*Lacy v. State,* (1982) Ind., 438 N.E.2d 968, 970. We keep these concepts in mind as we address Elliott's allegations.

### (1) *Prosecutorial Misconduct*

██ Elliott insists the trial court committed fundamental error when it allowed the prosecutor, during final argument, to discuss facts not in evidence, misstate evidence, draw inferences contrary to the evidence, and imply Elliott was guilty of a more serious crime than charged. Elliott failed to object to any of the instances but insists they were fundamental error. Our threshold inquiry is whether there would have been error even if he had objected. As our supreme court stated regarding this inquiry in *Maldonado v. State,* (1976) 265 Ind. 492, 355 N.E.2d 843:

> "1. *The Court first determines that the prosecutor in fact engaged in misconduct.* This determination is made by reference to the case law and the disciplinary rules of the Code of Professional Responsibility as adopted in this State . . .
>
> 2. The Court *then* considers whether the misconduct, under all the circumstances, 'placed [the defendant] in a position of grave peril to which he should not have been subjected.' . . . . "

*Id.* at 498, 355 N.E.2d at 848 (emphasis added); *Johnson v. State,* (1982) Ind., 436 N.E.2d 796. Misstatement of evidence, discussion of facts not in evidence, and drawing inferences contrary to the evidence was not error here so "long as the prosecutor [was] not merely implying a personal knowledge independent of the facts." *Bell v. State,* (1977) 267 Ind. 1, 8, 366 N.E.2d 1156, 1160. In the case here, the prosecutor hypothesized why no gunshot residue could be found on Elliott's hands. One theory he propounded was that he had had an opportunity to wash his hands at the hospital. This does not seem an unlikely hypothesis although there is no direct evidence to support it. In any event, the evidence disclosed that Elliott had ample opportunity before arriving at the hospital to cleanse his hands. We do not perceive the misstatement as to when he might have washed his hands as misconduct when the opportunity clearly existed for him to do so at another time.

Elliott also complains of the conclusion the prosecutor drew that he and Sheryl had fought in her home. The evidence supports such an inference: Elliott had scratches on his nose, chin, hands, and arms, there was blood from Sheryl's fingernails, her living room was messy while the rest of the home was neat, and her body exhibited a mutilated ear and bruised arms (bruising which may have come from needle punctures). During his closing argument, the prosecutor did indeed embellish on this evidence by characterizing the mutilation and bruises as "fresh" when there appears to have been no oral testimony to that effect. However, we must consider the context of these statements—the prosecutor was reviewing the photographs of Sheryl's body and pointing to the mutilation and bruises as support for his proposition the wounds had occurred during a recent struggle. The pictures were in evidence, and Elliott has not persuaded us such evidence did not support the prosecutor's statements. Further, a police officer testified, without objection, that Elliott told him he had struggled with Sheryl over the gun. Elliott is mainly contesting the inference the prosecutor drew, that he fought with Sheryl and shot her as a consequence. He would have us draw more favorable inferences than the prosecutor did by believing his version that he was trying to take the gun away when it discharged. This we cannot do.

We also do not see Elliott being harmed by statements he could have been charged with murder when, in actuality, it was within the prosecutor's discretion to decide which statute Elliott would be charged with violating. *See Roddy v. State,* (1979) Ind. App., 394 N.E.2d 1098. The prosecutor's statement was true, and we see no error. In addition, we note Elliott was not even convicted of the crime with which he was charged so it appears the jury was not affected by the statement.

None of these instances constituted prosecutorial misconduct, and, therefore, they could not be fundamental error. Combin-

ing them does not alter this conclusion. *See Bennett v. State,* (1981) Ind., 423 N.E.2d 588.

### (2) *Failing to Instruct on All Elements of Involuntary Manslaughter*

■ The next fundamental error which Elliott advances is the trial court's failure to instruct the jury on all the elements of involuntary manslaughter, particularly proximate cause. Again, trial counsel did not make timely objection to the court's instruction nor did he tender an instruction of his own. Thus, the error is waived if it is not fundamental.

■ In the case here, the instruction on the offense of involuntary manslaughter required the jury to find "1) the defendant 2) killed 3) another human being 4) while committing or attempting to commit Battery." The instructions further described the offense of battery. We agree with Elliott that the offense of manslaughter includes the element of proximate cause. As this court noted in *Coffelt v. State,* (1974) 159 Ind.App. 485, 307 N.E.2d 497:

> " 'To constitute the crime of manslaughter, there must be such legal relation between the commission of the unlawful act and the homicide, that it logically follows that the homicide occurred as a concomitant part of the perpetration of, or in furtherance of an attempt to commit, the unlawful act. Therefore it follows that death must be the natural result and the probable consequence of the commission of the unlawful act upon which the homicide is based.' "

*Id.* at 490, 307 N.E.2d at 500. (quoting *Votre v. State,* (1923) 192 Ind. 684, 686, 138 N.E. 257, 257). In the instant prosecution, the trial court did not instruct on proximate causation, i.e. that the jury could find Elliott guilty only if they found Sheryl died as

a result of his battery upon her. However, the inquiry remains whether such failure was fundamental error.

Some support for Elliott's contention can be found in language from the recent supreme court case of *Lacy v. State, supra.* In that opinion, the court stated that delivering a jury instruction detailing the elements of a criminal offense is an integral part in a criminal trial and further opined the total failure to so instruct would be reversible error. However, these pronouncements are arguably dictum inasmuch as the supreme court found the judge had not committed error in Lacy's trial because the elements of the crime were given as preliminary instructions, and, thus, there was no reason to even look for fundamental error. In formulating this hypothetical ground for reversal, the supreme court cited a U.S. Supreme Court case which more specifically addressed Elliott's issue.

In *Screws v. United States,* (1945) 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, the defendants were convicted of willfully depriving an individual of his civil rights when they beat him to death. Inherent in the violated statute, § 20, 18 U.S.C. § 52 (1940) * was the threshold requirement that such deprivation had been "willfully" accomplished, i.e. that defendants purposefully dispossessed the victim of his constitutional rights. Instead, the trial court had instructed the jury that they need only to find the defendants had acted with a *generally* bad purpose. The Supreme Court reversed the convictions, holding *sua sponte* that the failure to correctly instruct on an essential element of this offense was fundamental error. We note the importance of this decision to the particular federal crime involved but are unconvinced it is applicable to Elliott's situation.

---

\* Section 20 of 18 U.S.C. § 52 read, at the time of the *Screws* opinion:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to

different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both." The substance of this statute is now found at 18 U.S.C. § 242 (1976).

In *Screws,* the defendants' intent was basic to the underlying charge, and the trial court's instruction reciting the wrong standard was such error as to change the complexion of the offense. Under the circumstances, Justice Douglas's language in the plurality opinion, which addresses the alleged omission of an essential element, might appear unnecessarily broad when, in truth, the case involved the giving of an entirely incorrect instruction. Such is not the case here. Elliott's problem lies more in line with the tenor of cases premised upon the more recent Supreme Court position enunciated in *United States v. Park,* (1975) 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489, where an element is missing in a jury's instruction but no fundamental error exists because the element has been an important consideration elsewhere in the jury charge or throughout the entire trial. *Cf., State v. Kurvin,* (1982) 186 Conn. 555, 442 A.2d 1327 (*Screws* and *Park* distinguished as representing two separate variations of appellate review).

In *Park,* the president of a national grocery store chain was convicted of causing adulterated food to be sold through interstate commerce. The trial court instructed the jury to convict if Park held a position of authority in the operation of the business but failed to instruct specifically whether Park "had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so." *United States v. Park,* 421 U.S. at 673–74, 95 S.Ct. at 1912. The Supreme Court stated that, when viewed in the context of the whole charge and of the whole trial, the failure to deliver the proper instruction was not fundamental error because the jury could not have failed to be aware the defendant's responsibility, and not his position, was at issue. *See, e.g., United States v. Mangieri,* (D.C.Cir.1982) 694 F.2d 1270; *see also Lopez v. United States,* (1963) 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462; *Duling v. State,* (1976) 170 Ind.App. 607, 354 N.E.2d 286. This treatment has been adapted to other situations wherein an essential element of a crime is absent from the jury's charge, *e.g., United States v. Graves,* (5th Cir.1982) 669 F.2d 964 (no instruction during trial for transporting stolen property in interstate commerce that defendant must know property was stolen), and there is plain error only if there is substantial harm to the defendant's due process rights. *United States v. Graves, supra; People v. Preston,* (1978) 61 Ill. App.3d 434, 18 Ill.Dec. 908, 378 N.E.2d 372 (failure to instruct that State was required to negate exceptions to offense of unlawful use of weapons). In the prosecution herein, there was no question that Sheryl died as the result of a battery nor did Elliott controvert the same at trial. *See United States v. Cubean,* (8th Cir.1979) 611 F.2d 257, *cert. denied* (1980) 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 604 (for robbery of federally insured savings and loan institution, court did not instruct that institution had to be federally insured); *People v. Jennings,* (1977) 47 Ill.App.3d 226, 5 Ill.Dec. 632, 361 N.E.2d 1160 (court did not instruct that knowledge was element of offense of illegal transportation of liquor). We additionally note that, here, the prosecutor went to great pains in his closing argument to describe the element of proximate causation, although not in so many words. Record, p. 600. This too eases the onus of the failure to instruct. *See United States v. Silla,* (9th Cir.1977) 555 F.2d 703 (conviction for possession of marijuana with intent to distribute upheld although no instruction on intent to distribute).

Another important factor to consider is whether Elliott was prejudiced by the failure to instruct on the element of proximate causation, *see United States v. Cubean, supra.* Allaying the fear of prejudice led to the affirmance, based on an earlier supreme court case, of an Indiana conviction for stealing an automobile where the court failed to instruct on a necessary element— that the taking must be without the owner's consent. Our supreme court said:

"In *Rokvic v. State,* (1924), 194 Ind. 450, 143 N.E. 357, 359, in which the appellant was charged with vehicle taking, this

court said: 'It is next urged that it [court's instruction No. 26] does not state that the property must have been taken without the consent of the owner. This is a necessary element, but the uncontradicted evidence was that the property had been taken without the owner's consent.' The court did not hold the instruction erroneous for the named defect. The testimony of one of the parties who took the automobile ws that they started out to steal a Ford Coupe; that he got the car at Rushville on Second street in front of the American Security Company without saying anything to any one before he drove it away. From this evidence it could be inferred that the stolen automobile was taken without the consent of the owner. It does not appear that this instruction was prejudicial to the appellant. The giving of same did not constitute error."

*Headlee v. State,* (1929) 201 Ind. 545, 557, 168 N.E. 692, 696. Thus, we find support from earlier expressions of our supreme court that nonprejudicial omissions in instructions of a necessary element of the crime is not reversible error. In the case before us, we find no prejudice as we do not believe the jury could have reasonably determined the proximate cause of Sheryl's death was other than the battery inflicted upon her. *See People v. Jennings, supra.*

Our result here is not in conflict, but rather finds support, in our recent decision in *Higginbotham v. State,* (1981) Ind.App., 427 N.E.2d 896. In *Higginbotham,* the defendant had been convicted of driving under the influence of an intoxicating beverage resulting in the death of a human being. The major thrust of his defense was that, even assuming he had been intoxicated or driving while intoxicated, these circumstances were not the proximate cause of the victim's death. Rather, he asserted a blinding setting sun which interfered with his vision plus the victim's presence on the roadway caused the death. He supported his defense by tendering complete instructions on causation. In determining that Higginbotham was harmed by the court's failure to instruct on causation, Judge Young, speaking for this court, stated:

"Thus, defendant was charged in a manner requiring proof of causation. The statute required causation. Defendant tendered complete instructions on causation. The trial court concluded causation was not required. The thrust of the defense was that even if intoxicated or driving while intoxicated, such was in no way the cause of the accident or death.

Based upon these circumstances we hold defendant was harmed by the lack of instruction on causation. The instruction did trace the wording of the statute as far as the 'results in' language. It also spoke in terms of loss of normal control of one's faculties caused by use of alcohol. However, the instruction did not require the jury to find, in order to convict defendant, that the death was caused by or a consequence of the operation of a vehicle with loss of normal control of faculties because of intoxication. A term of such considerable generality, *Bailey [v. State,* (1980) Ind., 412 N.E.2d 56], *supra,* requires definition in a case such as the one before us where the core of the defense was that the intoxication did not in any way relate to the accident."

427 N.E.2d at 900.

The instant circumstances reveal that Sheryl was shot either by her own hand or by Elliott. Elliott entirely denies he in any manner instigated Sheryl's death, that in fact he tried to prevent it. He has brought forth no defense that some outside agency was the actual proximate cause as Higginbotham did. Higginbotham did not deny his car ran into the victim and the victim died. He declared the sun and the victim's actions caused the death and denied it was the result of any unlawfully intoxicated state, even if present. Elliott's position differs to the extent that he defends by denying any role in the death whatsoever. In the absence of reliance upon the element of proximate causation in Elliott's case and in the absence of probative evidence that Sheryl died of other than a gunshot wound perpetrated by herself or Elliott, we find there was no such blatant error or substan-

tial potential for harm to force us to categorize this error as fundamental or the trial proceedings as a mockery of justice. *See Lacy v. State, supra.* The jury's resolution of the conflicting evidence would have been in no way affected by such additional instruction. *See Higginbotham v. State, supra.*

In light of all the foregoing, we cannot find Elliott was a victim of fundamental error, and he has furnished us with no cause for reversal in this respect. Elliott was entitled to a fair trial, not a perfect one. *See Frances v. State,* (1974) 262 Ind. 353, 316 N.E.2d 364; *Pineiro v. State,* (1982) Ind.App., 434 N.E.2d 135.

**(3) *Information Insufficient to Charge Involuntary Manslaughter***

■ Elliott contends it was fundamental error for the trial court to allow the conviction to stand where the information did not sufficiently inform the defendant of the charge of involuntary manslaughter. It is well established "that due process requires that a defendant be given notice of the crime or crimes with which he is charged so that he can prepare his defense. Absent sufficient notice that a particular offense is charged, a defendant cannot be convicted of that crime. Ind. Const. art. 1, § 13, *Blackburn v. State,* (1973) 260 Ind. 5, 11, 291 N.E.2d 686, 690." *Lewis v. State,* (1980) Ind.App., 413 N.E.2d 1069, 1071. A defendant is considered to have notice of and can be convicted of any crimes that are lesser included offenses of the charged crime. *See id.; Roddy v. State, supra.*

■ The information clearly charges Elliott with voluntary manslaughter, and this court recently said it is possible for involuntary manslaughter to be its lesser included offense. *Ford v. State,* (1982) Ind.App., 439 N.E.2d 648. The elements of involuntary manslaughter, a killing while committing a battery (IC 35–42–1–4), are charged in the information. It only differs from the crime charged, voluntary manslaughter, in that it does not require the killing to be knowing or intentional. *See* Ind.Code 35–42–1–3. Thus, the information herein charged a lesser included offense as defined in Ind.Code 35–41–1–2 ("established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged"). *See Lewis v. State, supra; McGairk v. State,* (1980) Ind.App., 399 N.E.2d 408. Elliott had sufficient notice he faced a possible conviction for involuntary manslaughter.

**(4) *Elliott's Statements as Evidence***

■ Elliott argues the trial court committed fundamental error by allowing his statements into evidence. Elliott is correct in his assertion that his out-of-court statements are not admissible unless there is independent proof of the corpus delicti. *White v. State,* (1980) Ind.App., 404 N.E.2d 1144. However, the corpus delicti need not be proven beyond a reasonable doubt and may be based on circumstantial evidence, and the State was not required to establish the corpus delicti before introducing the statements as the order of proof is within the trial court's discretion. *Id.* Elliott essentially repeats his argument that the evidence is insufficient to support his conviction.

■ The independent evidence in this case established that Sheryl died as the result of a bullet wound in the neck.

The apparent scene of the crime, Sheryl's house, was found locked and in disarray, with a number of items strewn all over the living room. Blood was splattered in different locations throughout the living room, and a trail of blood led out the front door, across the porch, and down the sidewalk. Blood was also found on the padlock which locked the front door. A gunshot residue test made on Sheryl proved inconclusive; that is, no determination could be made as to whether or not Sheryl had fired or handled the weapon. At the time Elliott arrived at the hospital with Sheryl, he had blood all over his clothes and a number of scratch marks on his body. Scratch marks were observed along his nose and chin, a fresh scratch was seen on his knuckle, and a fresh wound was observed on his left wrist. Further evidence revealed that a laboratory

analysis of fingernail clippings from Sheryl disclosed the presence of human blood at the tip and in the middle of the fingernails. The above independent evidence gave rise to a reasonable inference that Sheryl was shot in her home during a struggle. This was sufficient to establish the corpus delicti of the crime charged independent of Elliott's statements.

(5) *Combination of Errors as Fundamental Error*

Elliott's final contention is that even if one of the above errors was not sufficient to constitute fundamental error, two or more cumulatively do constitute fundamental error. The above issues do not individu-ally present fundamental error, and the combination of them does not change their character. *See Bennett v. State, supra.*

We affirm.

SHIELDS, J. (sitting by designation), concurs.

YOUNG, P.J., concurs in result.