## WILSON v. STATE OF INDIANA.

[No. 27,874. Filed December 21, 1943.]

66

*Theodore Lockyear,* of Evansville, for appellant.

*James A. Emmert,* Attorney General, *Frank Hamilton,* First Assistant Attorney General, and *Frank E. Coughlin,* Deputy Attorney General, for the State.

RICHMAN, J.—Appellant was convicted by a jury of the offense of receiving and concealing stolen goods of value less than $25. He was given a small fine and sentenced for an indeterminate term of one to five years. After motion for new trial had been filed, and too late for amendment thereof, his present counsel as "public defender" was appointed and prosecutes this appeal at the expense of the county. He frankly states that the errors upon which he relies are not presented in the motion for new trial, the overruling of which is the only error assigned, but earnestly insists that on account of prejudicial statements of the trial judge, invading the province of the jury, to which no objection was made by the lawyer who purported to represent appellant during the trial, the appellant's substantial rights were so violated that regardless of procedural requirements with respect to saving and presenting errors we should reverse the judgment. His position may be summarized by the statement that appellant was deprived of fundamental rights guaranteed by our constitution in that he had merely a perfunctory representation by counsel in a trial before a judge who was not impartial but stepped out of his proper role on several occasions to assist in the prosecution and to convey to the jury his opinion

that the appellant was not worthy of belief. The Attorney General, whose duty it is to represent the state in criminal appeals, answers that the questions are not properly presented and that the evidence is sufficient to sustain the verdict. He also adds a history, developed on cross-examination of appellant, of seven previous convictions of various crimes including assault and battery, driving an automobile while intoxicated, burglary, arson and adultery which evidence appellant failed to recite in that part of his brief entitled "Statement of the Record." The Attorney General will doubtless concede that a defendant with a long criminal record is just as much entitled to a fair trial as a person brought into court for the first time to answer a criminal charge. Our concern therefore is not with the extent of his criminal career but with the record of the trial resulting in the judgment from which this appeal is taken. Upon examination of that record we find that his present counsel has called our attention to only the flagrant errors and that many irregularities occurred which are not referred to in the brief.

When appellant was arraigned December 29, 1941, he was represented by the then "public defender," sometimes known as "pauper attorney." His bond was fixed at $1,000 and trial set for January 7, 1942. On the 8th of January the bond was reduced to $500. On the 23rd it was increased to $1,000, a warrant was ordered and trial set for January 28th on which day his bond was declared forfeited because of his failure to appear. It is disclosed by the evidence that he went to California and was extradited. Apparently he left before the 23rd and the date of trial was set with knowledge that he could not appear. The next entry was made July 2, 1942, when another lawyer entered his appear-

ance and filed motion and affidavit for a change of venue from the regular judge. A few days later the bond was raised to $2,000, the motion for change of venue was sustained and a judge was selected and qualified. On the 24th of August the forfeiture of the bond was set aside and the surety released. A few days later the lawyer withdrew his appearance with the consent of the court. It appears from the evidence that he was paid $30 by appellant. The cause was finally tried on October 13, 1942, and then for the first time John L. Roberts, the attorney who purported to represent him during the trial, entered his appearance. The trial was begun, completed and verdict returned in one day. On the 15th of October appellant appeared accompanied by Mr. Roberts and was sentenced. A motion for new trial was filed November 12th. Obviously it was prepared by a layman or by a lawyer who was ignorant of the requirements of a motion for new trial. It states that the appellant *"in propria persona"* makes the motion and it is signed by him. At the same time he filed a motion, also signed by him, to prosecute an appeal as a poor person. After the filing thereof the public defender who had appeared at the time of appellant's arraignment was again appointed as his attorney but there is no record of anything done by him. January 7, 1943, appellant's present counsel was appointed by the court. Obviously he had no opportunity of knowing what had occurred during the trial except from hearsay unless he had procured a transcript of the evidence which does not appear. What was said in oral argument of the motion for new trial is not revealed. After it was overruled present counsel procured bills of exceptions containing the evidence and the instructions which are properly in the record.

In making its case the state presented five witnesses,

in order as follows: Ralph I. Smith, an officer of Service Glass Company from whom the goods were alleged to have been stolen, a policeman who without search warrant went to appellant's house in his absence and obtained the goods, a policeman who went to California to extradite appellant, a deputy clerk of the court who identified records showing declaration of forfeiture of the bond which record was introduced without objection, and Ernest Martin who testified that he stole the specific items of merchandise from his employer, Service Glass Company, and sold them to appellant for small amounts. Martin had pleaded guilty, sentence was withheld, and he was released on $100 bond with Mr. Smith as surety. Appellant testified and called two other witnesses, a bookkeeper of the company who had been subpoenaed to bring books and records showing all of appellant's transactions with the Glass Company but who was excused without testifying when it appeared that she had not brought the books and records but merely a statement of what she had found with respect to appellant's transactions with the company during the year 1941, and a second witness whose testimony was worthless since it appeared he knew nothing about the transactions. Appellant, while on the stand, stated that "Jess" Martin was supposed to have been subpoenaed before the trial but he was not present. Mr. Roberts evidently made no effort before the trial began to ascertain whether or not the bookkeeper had brought the records which she was subpoenaed to produce. Either he failed to carry out appellant's instructions to subpoena Martin or he neglected to ascertain that the subpoena had been disobeyed or he was content to proceed in Martin's absence. After the prosecuting attorney had completed his cross-examination of appellant, toward the end of which his previous crimi-

nal record had been brought to the attention of the jury and admitted by appellant, the judge examined appellant as follows:

"Q. After all this you still say here you got that sixty pounds of metal . . .

"A. Body solder.

"Q. Yes. Where did you get it?

"A. The majority was bought from Service Glass Company. It's on the books. It has to be down there. I have got at least 200 statements.

"Q. How long have you traded at the Service Glass Company?

"A. 1939, 1940, 1941.

"Q. What color are the slips that you are supposed to have?

"A. They are yellow. That's the statements, they are the ones the customer gets.

"Q. You have gone down there and purchased things, haven't you?

"A. Yes, sir.

"Q. You know that everytihng that is purchased in there is written on a roll of typed sales tickets that is continuous? That every one is colored and every sale is recorded?

"A. Yes, sir. That's what I want in court as evidence.

"Q. One, the person gets one, they keep one and one is for the bookkeeper?

"A. In order to prevent any of them being taken out I asked the books to be brought up here.

"Q. Do you know if they are all yellow?

"A. The one I got is yellow.

"Q. Why not use that?

"A. That's what I am talking about. That was at the garage out there, but I can't get out there

to look. I suppose they are all gone now. They went out there and moved everything, destroyed things while I wasn't there.

"Q. It's awfully easy to come up and throw a smoke screen around. I am going to give you a chance to go down there to the Company and go through their files completely. That's fair. On the other hand it was his duty to have this evidence ready.

"A. I asked that they be subpoenaed in here. They are no bigger than I am and I am subpoenaed in here. And what about that Jess Martin. Where's he at? He was supposed to be subpoenaed and he's not here.

"By the Court: That's all."

Another witness was then examined after which the judge said:

"Show that the Court at this time permits the defendant to adjourn for two hours, in which to secure additional evidence which he contends he can offer at that time."

Following the recess the judge said:

"The Court on its own motion will permit the defendant to take the stand and testify what the rest of the witnesses would testify to if they were present. We will see if it is material to the case."

Appellant was then put on the witness stand and examined by the judge. He testified that "Jess" Martin was supervisor of a laundry company whose automobiles appellant had repaired and that for the purpose of making the repairs he had received from this company some of the goods which it was alleged had been stolen, namely, "body solder, masking tape, sand paper, sanding discs" and other material. The judge interrupted, "I don't see that anything you have said has any material bearing on the soldering charge." When appellant

insisted that he had received body solder from the laundry company the judge said:

> "This case has been set for trial for three weeks or longer. You have had people on the outside that were friends that were working that could have gotten evidence for you. You can't keep a jury penned up for several days while you prepare your case during the trial. The State is going farther now than is ordinarily permitted in these matters to give you a chance to prove anything that you can bring up. But I see nothing that will materially alter what you have said. You have testified yourself that you got these things."

The prosecuting attorney interjected: "This man couldn't possibly testify that he delivered this specific property to this defendant." Appellant then stated that he had given $30 to a lawyer to represent him "and he withdrew without even consulting me." The court said, "Alright, alright." Then appellant stated that Mr. Roberts "has taken the case on a small fee as to what I can get together. I don't see how if I don't get a fair trial this time, how I can go about getting another lawyer or getting a fair trial." Mr. Roberts, who had been silent throughout this examination then remarked, "I don't know of any more competent evidence, your honor," and the court informed the jury that "The defendant rests."

Concerning this part of the proceedings appellant's present counsel in his brief makes the following pertinent observations:

> "The permission by the Court for the appellant to testify as to what another witness would say does not give the appellant the benefit of that witness' presence in the courtroom, substantiating his defense. To the jury, it would be merely the appellant re-testifying . . . If the appellant's rights were in jeopardy, due to the absence of the wit-

ness, the Court could have required his presence for failing to respond to a subpoena or could have granted sufficient continuance to have secured the presence of this witness in court. Any procedure short of this does not adequately protect the appellant's rights in the situation as disclosed by the record. The same may be said upon the subject of Proposition V, wherein the Court granted an adjournment for two hours. It is not apparent from the record how the appellant was to make use of this two hours and what better facilities he had at his disposal then than he had had previously, nor does the record disclose what he actually did within those two hours."

It should be added that the apparent purpose of adjournment was to permit appellant "to go down there to the company and go through their files completely" which may have been an impossible task in the two hours allotted. The failure to have Martin present is attributable in the first instance to appellant's lawyer, but having recognized appellant's need for time the judge himself is responsible for the inadequacy of the remedy.

Delving into the record for further light on the conduct of Mr. Roberts we find that when Mr. Smith was on the stand the prosecuting attorney asked without objection: "And was the property or the merchandise that you received from the Evansville police department the property of The Service Glass Company." He answered: "The body solder had our name stamped on it which was proof that it was our body solder." This the jury may have believed, although in reality it was proof of no more than the fact that originally the material had come from the Service Glass Company. Appellant's attorney made no attempt to explain or mitigate the effect of this statement. The same witness was asked if his company had a record of all sales made

and the manner in which they were made to which he replied in the affirmative. Then the following occurred:

"Q. And are these exhibits which have been marked State's exhibits 3, 4, 5 and 6 evidence of that system?

"A. That's right.

"Mr. Meyer. The State now offers to introduce in evidence State's exhibits 1, 2, 3, 4, 5 and 6.

"By the Court: Care to see the exhibits?

"By the Court: That's the file in a big box where the party making a purchase is given one of the slips showing he made a purchase, and you keep the other slip for your reference?

"A. That's right. The copy is in triplicate. We file one under the customer's name, providing he is a regular customer; one is the bookkeeping copy; and the other is the customer's.

"By the Court: Every piece of merchandise sold in your place of business is put on these forms of bookkeeping?

"A. Yes, sir.

"By the Court: And it was through those records you have searched and found only those records of solder purchased by Mr. Wilson?

"A. That's right.

"By the Court: You may show the Exhibits all introduced and read in evidence."

One of the exhibits so introduced had a tag on it reading:

"Hold — 12-26-41 — Gale

OVER

Bin 12
Got out of house at 204
Bellemeade Ave. — Cecil Wilson's
home — See Arrest No. 17191

Stolen from Service Glass Co.
2 Bars Body Solder"

And all this time appellant's attorney was silent.

A policeman was permitted to testify that appellant had fled from the jurisdiction to California. Mr. Roberts' objection was overruled. This was not error. 22 C. J. S. *Criminal Law* § 625, p. 956. Then the witness, with slight prompting, volunteered many details of what happened in California including the fact that appellant struck a district attorney in the hope that prosecution there would prevent his extradition and that he was shackled and handcuffed on the way back and wasn't in a position to cause trouble for "even a minute." The only objection by Mr. Roberts was made after the testimony had been received in the following language. "I object to that stuff, your honor, all outside the issues." Without objection the state was permitted to introduce the order book entry declaring the bond forfeited. No attempt was made by the attorney thereafter to show that that order was set aside but the jury was left with the impression that the surety had suffered financial loss by reason of appellant's leaving the jurisdiction.

When the bookkeeper was on the witness stand and it appeared that she had not complied with the subpoena to bring in books and records, the following occurred:

"By the Court: And what you are ready to testify to and what Mr. Smith testified to is that you keep records of every sale cash and otherwise, made for the complete year of 1941?

"A. That's right.

"Mr. Roberts: That's all at the present time, your honor.

"Mr. Cecil Wilson
the defendant: Is there any way of bringing

those books and accounts with the plaintiff in the year 1941 up here?

"Mr. Roberts: Object to the defendant testifying unless he takes the witness stand.

"By the Court: Anything I say to the defendant at this time I don't want to prejudice you gentlemen. Sometimes when a man is cited for a crime he becomes a little excited. Don't pay any attention to any verbal statements made between the court and the defendant."

Appellant was asked by his attorney whether he had his old accounts and receipt books. He replied that they had been left in the garage which was under padlock for sometime and part of them were destroyed but he was sure that there were as many as 150 statements. The record then shows the following:

"Q. Do you know anybody that you can get to go down there and get those statements?

"A. Well, as to whether they would be there or not I don't know.

"By the Court: Mr. Wilson, you are being charged with one crime. I would suggest that you tell the truth about this matter and not commit perjury.

"Q. Have you or have you not got these account books down there?

"A. That I don't know. That's been seven or eight months ago. As to whether they would still be there or not . . . I do know there was as many as 150 statements. The records from Mr. Smith show there was a mere seven or eight times I bought from the Service Glass Company."

At the end of appellant's direct examination, without any excuse therefor shown by the context, the judge said, "That is the first time I ever heard a witness make an argument to the jury." Appellant remarked: "I could answer that in a mutual question." The retort

was ill advised but not without justification. To none of these prejudicial statements made by the judge did appellant's attorney interpose the slightest objection. Nor was any effort made by tendered instruction to alleviate their damaging effect.

The circumstances under which the two police officers visited appellant's home are not clearly disclosed. He testified that he had trouble with his wife the night before the search and that he called the officers. Whether this was a belated answer to his call or a second trip is not clear. One of them testified that when he and his partner arrived appellant's wife was there.

"Q.    And you and your brother officer searched the premises?

A.    We did."

On cross-examination he said that the merchandise was in "one container in the kitchen cabinet." It is hard to understand why a visit to straighten out domestic trouble would justify a search of the premises. The only mention of a search warrant was in Mr. Roberts' direct examination of his own client as follows:

"Q.    At the time they took this stuff away from your house did the Police have a search warrant?

"A.    No, sir.

"Q.    You haven't made any effort to suppress that evidence, have you?

"A.    No, sir."

Perhaps the attorney had begun to realize that much of the damaging evidence might have been suppressed and was seeking to put the blame upon his client for failure to file a motion to that end.

We agree with the Attorney General that there is sufficient evidence, if believed, to sustain the verdict.

But without the testimony of the "accomplice" there are only circumstantial facts and from these a jury would have difficulty in concluding that appellant was guilty. Substantially, therefore, the issue was to be determined by the credibility of two witnesses, one, the employee who admitted that he stole and sold the goods, the other, appellant, who contradicted in every respect the story of that employee. When the judge indicated that appellant was perjuring or about to perjure himself appellant was so discredited before the jury that an adverse verdict was a foregone conclusion. This one remark was error sufficient, if properly presented, to reverse the judgment. *Kintner* v. *State* (1873), 45 Ind. 175, 177; *Brunker* v. *Cummins* (1892), 133 Ind. 443, 450, 32 N. E. 732, 734; *Rhodes* v. *State* (1930), 202 Ind. 159, 171, 172 N. E. 176, 180. But the lawyer for the defense did not protest, made no record, and left to appellant himself the preparation and filing of the motion for new trial.

With such a record before us, what is our duty? The easy course would have been to examine the motion for new trial and, having found that the errors relied upon are not mentioned therein, to have affirmed the judgment. For such a decision there are many precedents. But in a case involving an appellant's life or liberty we may not ignore prejudicial errors affecting his constitutional rights when, as here, they are clearly and adequately presented in appellant's brief with supporting bill of exceptions. The procedural rules that would prevent their consideration must give way to the fundamental principles of due process. For this course also there are precedents.

Article 1, Section 13 of the Constitution of Indiana guarantees to an accused the right of counsel. The

same right is guaranteed by the Sixth Amendment of the Constitution of the United States.

It was held in *Powell* v. *Alabama* (1932), 287 U. S. 45, 77 L. Ed. 158, 53 Sup. Ct. 55, 84 A. L. R. 527, that the specific provision of Article Six did not exclude that right from the protection of the "due process" clause of the Fourteenth Amendment. In *Johnson* v. *Zerbst, Warden* (1937), 304 U. S. 458, 82 L. Ed. 1461, 58 Sup. Ct. 1019, the court said:

> "If the accused, however, is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty."

In *Knox County Council* v. *State ex rel. McCormick* (1940), 217 Ind. 493, 29 N. E. (2d) 405, 130 A. L. R. 1427, referring to the two cases just cited the opinion states:

> "As pointed out in the beginning, the United States Supreme Court has held that, under the Federal Constitution, *there can be no valid trial of a criminal case unless the defendant is adequately defended by counsel,* and that a judgment rendered under such circumstances is void. This court has consistently held that, under the Constitution of Indiana, *there can be no valid judgment against a defendant in a criminal case unless he has been offered, and, if so desired, provided with, adequate counsel.*"

It will be noted that by the use of the word "adequate" this statement goes somewhat farther than the express provision of either constitution. In a recent opinion we said: "It is the duty of the trial court to appoint competent counsel to advise the defendant in the first instance." *State ex rel. White* v. *Hilgeman, Judge*

(1941), 218 Ind. 572, 34 N. E. (2d) 129. An earlier opinion contains the statement:

> "Justice demands that the appellant should not be put to death as a result of his former trial; but that he should be given another trial in which he will have an opportunity to present his evidence and to be represented by competent counsel." *Sanchez* v. *State* (1927), 199 Ind. 235, 247, 157 N. E. 1, 5.

It seems unnecessary to search for other cases where either the word "adequate" or "competent" is used. Nor need we now draw a line, if there is one, between competency and incompetency. The spirit of these constitutional provisions requires that an accused must have something more than a perfunctory representation. This is true whether the attorney is appointed by the court or engaged by the accused. In *Sanchez* v. *State, supra,* where judgment was reversed for lack of proper representation, it was said:

> "In the instant case, the attorney who appeared for the defendant was voluntarily employed by him. But it should be taken into consideration that the appellant was only eighteen years old, was a citizen of another country, and, according to the motion for a new trial, 'did not understand legal procedure and did not understand the English language.' He employed the attorney who tendered his services to him, naturally believing that he had sufficient experience and enough ability to conduct properly his defense."

Doubtless appellant thought the same of Mr. Roberts who took "the case on a small fee as to what I can get together." Whether he is paid by the county or the accused, whether he is paid much or little or nothing at all, the attorney's obligation to his client is the same.

In *Castro* v. *State* (1925), 196 Ind. 385, 147 N. E.

321, the court was not convinced that appellant's defense had been inadequate and affirmed the judgment, but made this pregnant statement:

"And mere perfunctory action by an attorney assuming to represent one accused of crime which falls short of presenting the evidence favorable to him and invoking the rules of law intended to prevent conviction for an offense of which the accused is innocent, or the imposition of a penalty more severe than is deserved, should not be tolerated."

Here we have a conviction largely dependent upon the testimony of a thief who charged appellant with the receipt of his loot. Important evidence admitted without objection seems to have been within the purview of a motion to suppress for lack of a search warrant. Without objection an exhibit was admitted containing a label describing the exhibit as stolen which was one of the facts to be proved. Appellant was deprived of the right to have in court the man described by him as his "best witness." His attorney acquiesced in the bookkeeper's refusal to comply with the terms of the subpoena and was content with her statement on the witness stand, not heretofore noted, that her search of the company's records was confined to only one of the three years when appellant did business with her company and "in my opinion to go back any further would be useless . . . What he bought in 1939 and 1940 wouldn't mean anything." Mr. Roberts criticized his own client before the jury for asking the judge if there was not some way to get this evidence. Of all his derelictions least understandable is his failure to object when the judge flagrantly invaded the province of the jury by casting doubt upon the credibility of

his client, the only witness that could and did contradict the testimony of the confessed thief.

The constitutional provisions above mentioned also guarantee the accused a public trial by an impartial jury. It is equally important that the judge be impartial. This is a concept of ancient origin inherent in the common law. Our much abused statutes permitting change of venue from a judge on account of bias and prejudice recognize this basic right. The federal practice permitting the judge to comment on the evidence does not prevail in our State courts. It is wholly the function of the jury to appraise the credibility of the witnesses. Their examination is usually left to counsel. "It is true, a trial court in any case may, within reasonable limits, interrogate a witness if done in a manner that will not improperly influence the jury." *Rhodes* v. *State, supra*. A fair minded judge observing the incompetency of an attorney for the defense would be expected to take more than ordinary care to protect the rights of the accused. It was not so in this case. He not only examined and cross-examined witnesses beyond reasonable bounds but on the several mentioned occasions must have improperly influenced the jury by indicating that appellant's defense was without merit and his testimony false. His conduct of the trial was quite unfair. We would not leave the impression that the trial judge was motivated by ill will or malice. He was a practicing lawyer, not an elected judge. His selection by striking indicates that he was more satisfactory to appellant than one other on the list of three. When he entered the trial he was probably disinterested and unbiased. His attitude during the trial may be explained by lack of judicial experience. Appellant's demeanor perhaps was exasperating and his story may have been untrue. But none of this ex-

cuses or alleviates the prejudice engendered against appellant by the unjudicial innuendo and argument to the jury. A competent lawyer for the defense, very early in the trial, would by objection have reminded the judge of his judicial duty. Such action might have forestalled further invasion of the province of the jury.

In conclusion we add a paragraph that may avert misconception of the rationale of our decision. We do not hold that a defeated litigant in every or the usual case where his attorney has ignorantly or carelessly failed to save and present an error' may nevertheless have it reviewed and made the basis of reversal of the judgment. Ordinarily procedural rules must be observed by litigants and may not be ignored by reviewing courts. To hold otherwise would invite appeals and violate precedents that have given necessary order and stability to our appellate practice. But when it is made to appear by a record before us that a so-called trial did not meet the requirements of due process of law, it is within the power of this court to take cognizance of the errors that resulted in depriving the appellant of his constitutional rights. When, as here, there has been such a lack of representation as to be equivalent to or worse than no representation whatsoever and as a result thereof the judge misused the opportunity thus given to impress upon the jury his view that the defendant was guilty and ought to be convicted, we are left with no alternative but to exercise the power that is in this court to remand the cause for such a trial as will not deny but will afford to the accused the protection guaranteed by our Bill of Rights and the Constitution of the United States.

The judgment is reversed for further proceedings in conformity with this opinion.

NOTE.—Reported in 51 N. E. (2d) 848.