**Kenneth J. HOEMIG, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 02A03–8710–CR–285.

Court of Appeals of Indiana, Third District.

April 11, 1988.

Rehearing Denied May 19, 1988.

Donald C. Swanson, Jr., Fort Wayne, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

STATON, Judge.

Kenneth J. Hoemig was convicted by a jury of voluntary manslaughter, a class B felony, and battery, a class C felony.[1] He was sentenced to a term of eight years.[2] On appeal, Hoemig raises ten issues. Restated, they are:

1. Whether the trial court committed fundamental error by failing to instruct the jury on the use of deadly force in self-defense.

2. Whether the trial court should have *sua sponte* discharged him for an alleged speedy trial violation.

3. Whether the trial court erred by permitting certain rebuttal evidence by the State's witness Kenneth Angel.

4. Whether the trial court erred by overruling his objection to testimony concerning photographs of the crime scene already admitted into evidence.

5. Whether the trial court erred by overruling his objection to alleged improper character evidence.

6. Whether the trial court erred by overruling his objection to a hypothetical question asked of a State's witness.

7. Whether the trial court erred by admitting autopsy photographs of the decedent when the cause of death was not at issue.

8. Whether the trial court erred by sustaining an objection made by the prosecutor for which no ground was offered.

---

1.  *See* IC 1976, 35–42–1–3 (Burns Code Ed., Supp. 1987) (voluntary manslaughter) and IC 1976, 35–42–2–1 (Burns Code Ed., Supp.1987) (battery).

2.  IC 1976, 35–50–2–5 (Burns Code Ed., 1985 Repl.).

9. Whether the trial court erred by overruling his objection to final argument made by the prosecutor on his self-defense claim.

10. Whether the evidence is sufficient to support his conviction for voluntary manslaughter.

We affirm.

During the late evening hours of October 10, 1985, and the early morning hours of October 11, 1985, the defendant and Danny Ray Hobbs were fighting outside Jay's Pantry in Fort Wayne, Indiana. The defendant stabbed Hobbs, and Hobbs later died. The events that occurred between the time the fight started and the stabbing itself are unclear because no one who testified had a clear and complete view of the altercation.

Robert Lesure testified that he did not see everything that happened between the defendant and Hobbs because, at the time, he was trying to stop another altercation in the same parking lot. At one point, however:

"... I looked around and Kenneth Hoemig was on top of Danny Ray Hobbs, wedged in between the building and the short guard rail that protects the side of the building from cars parking in the lot, and he was on top of him, kind of crouched over and I thought I saw him smack him. It was dark, I couldn't see all that well. Kenneth went to get up and I saw him put something in his back pocket. At that time, Danny Ray Hobbs stood up, kind of had a hard time getting up because he was wedged down between the building and the guard rail and he had a hard time getting up and started to walk over and made some remark like, 'well, that's enough of your BS and now I'm going to cut you.' [A]nd then he looked down at himself and he seen that he was bleeding very badly and looked me in the eye and immediately had a real scared look in his face and he looked at me and he said that he was hurt and that he was hurt bad. And I said 'yes, I know you are, lay down.'

And he proceeded to get down and I ran into the bar...."

Record at pages 252–253.

Lesure also testified that (1) he did not actually see a weapon in the defendant's hands; (2) he did not see a weapon in the victim's hands; (3) things were happening fast, and it was dark; (4) after the fight, the defendant's clothing was not messed up and the defendant was not physically marked up; and (5) the victim had a lot of blood on him. He added that he himself was drunk that night.

Jeanetta Karst, the defendant's girlfriend, was also on the scene that night. She testified that she did not see a weapon on either the defendant or Hobbs.

Fort Wayne Police Officer David York testified that when he arrived on the scene, he asked bystanders, "Where did the assailant go?" Several persons then pointed at the defendant, who was standing up against a car. The defendant had been waiting there for police.

Officer York found a knife in the right front pocket of the defendant's trousers. It had blood on it. When Officer York took the defendant to the police car, the defendant said, "I'm the one that done it, I want to talk to you."

Later, when Officer York took the defendant's full statement, the defendant said that he had gotten into an argument with Hobbs. He said that they went outside, that Hobbs pulled out a pair of brass knuckles with a knife blade attached, and that Hobbs threatened him. At that time, the defendant pulled out his knife and stabbed Hobbs.

A photograph was admitted into evidence showing the defendant as he appeared after the stabbing. His hair was messed up, but his clothing—a three-piece suit—was not.

No one Officer York spoke with at the scene had seen the victim with a weapon. Officer York did not find a weapon—other than the defendant's—at the scene.

Dr. Alan McGee, the emergency room physician, testified that he found a pair of brass knuckles with a knife blade attached

in the victim's back pocket. There was blood on the knife, but no blood analysis was ever done on it.

The defendant testified, as did others, that as he and Jeanetta Karst were leaving Jay's Pantry, Karst and another woman became involved in an altercation in the parking lot. Then, he testified as follows:

A. Well, I was trying to decide whether to go in and physically try to drag her over to the car or get the car and bring it over there and then try to get her into the car and I was standing there with my hand on the edge of my pocket to get my keys and Dan hollered at me. He said, "I've had enough of your shit, I'm going to cut you" and he took a step towards me and I saw his hand go in his back pocket, I saw the knife strike his leg, I saw it go back down along his leg and he came like this—

Q. Okay, when you say he came like this, I don't know what you—

A. Well, if they were there, he was coming this way, towards me and I kind of turned and backed, but I ran into something, perhaps the van and Jeanette went against him, trying to push him and he just went right on by her and charged right at me.

Q. Where was the knife when he was charging at you?

A. Down by his leg.

Q. What did you do?

A. Like I said, I backed until I ran into something. It must have been the van and then I was pinned, and there was no place to go and I remember seeing him attacking me, but I do not remember drawing a knife and I do not remember stabbing Danny Hobbs at all, in no way.

Q. What do you next remember?

A. I remember a loud noise and a burst of light which was somebody either coming in or going in or coming out of the Pantry and I was in kind of a slumped position. I was breathing very hard. I remember Dan, with his hand by his back pocket and a hand out towards me, he was falling back and that's what I remembered next.

\* \* \* \* \* \*

Q. Danny Hobbs came at you, what went through your mind?

A. There was a look on Dan's face and in his eyes, now, and the way he moved with that knife and I knew that he was going to kill me.

\* \* \* \* \* \*

Q. Describe if you can, what actions or what caused that feeling to be in your mind.

A. His eyes were just ablaze, his lips were sneared and that movement where he stepped to the side, his hand went in, struck his leg and then it dropped right back down his leg and he kept ... avoided everybody and just kept coming at me.

\* \* \* \* \* \*

Q. Did you have any conversation after the stabbing with Danny Hobbs or did he have any conversation with you, that you remember?

A. Yeah, Danny hollered at me a second time, "I'm gonna cut you up" and again as he was laying over by the car, he hollered at me that he was going to kill me.

Record at pages 355–359.

The defendant admitted that he did not receive any cuts during the fight.

## I.

### Instruction on Self-Defense

IC 1976, 35–41–3–2 (Burns Code Ed., 1985 Repl.) provides, in pertinent part:

(a) A person is justified in using reasonable force against another person to protect himself or a third person from what he reasonably believes to be the imminent use of unlawful force. *However, a person is justified in using deadly force only if he reasonably believes that that force is necessary to prevent serious bodily injury to himself or a third person or the commission of a forcible felony.* No person in this

state shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary ...

(d) Notwithstanding subsections (a), (b), and (c) of this section, a person is not justified in using force if:

(1) He is committing, or is escaping after the commission of, a crime;

(2) He provokes unlawful action by another person, with intent to cause bodily injury to the other person; or

(3) He has entered into combat with another person or is the initial aggressor, unless he withdraws from the encounter and communicates to the other person his intent to do so and the other person nevertheless continues or threatens to continue unlawful action. (Emphasis added.)

However, the trial court instructed the jury as follows:

The defense of self-defense is defined in part by law as follows:

1. A person is justified in using reasonable force against another person to protect himself or a third person from what he reasonably believes to be the imminent use of unlawful force. No person in this State shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary.

2. Notwithstanding subsection (1) of this section, a person is not justified in using force if he provokes unlawful action by another person, with intent to cause bodily injury to the other person; or has entered into combat with another person or is the initial aggressor, unless he withdraws from the encounter and communicates to the other person his intent to do so and the other person nevertheless continues or threatens to continue unlawful action.

The State has the burden of disproving this defense beyond a reasonable doubt.

Record at page 169.

Thus, the jury was not instructed that a person is justified in using deadly force if

he reasonably believes that that force is necessary to prevent serious bodily injury to himself or a third person.

Because the defendant's trial counsel did not object to the trial court's instruction,[3] he waived any error predicated on the giving of the instruction. *Cox v. State* (1985), Ind., 475 N.E.2d 664, 669. However, the defendant now contends that the trial court committed fundamental error.

The "fundamental error" doctrine permits a reviewing court to consider the merits of an improperly raised error if the reviewing court finds that "the record reveals error so prejudicial to the rights of the Appellant that he could not have had a fair trial." *Winston v. State* (1975), 165 Ind.App. 369, 332 N.E.2d 229, 231, *trans. denied.* The doctrine of "fundamental error" allows an appellate court to by-pass the normal rules of appellate procedure, such as the requirement of a timely and specific objection, and, in so doing, to disregard the sound judicial policy underlying that procedure. *Id.,* 332 N.E.2d at 232. The circumvention of established procedures permitted by the "fundamental error" doctrine constitutes a forceful reason for our Supreme Court's reluctance to invoke the doctrine unless the record reveals "blatant error" that denies "the Appellant fundamental due process." *Id.*

The error claimed here is not a "blatant error" denying the defendant "fundamental due process." In *Winston, supra,* the court distinguished the two types of cases in which fundamental error has been found.

"The first distinction rests on the character of the alleged error and its effect on the trial as a whole. The Supreme Court's definition of fundamental error in *Grier v. State* [ (1968), 251 Ind. 214, 240 N.E.2d 494], as being an error which is so prejudicial to the defendant that he *"could not* have had a fair trial"*, Id.* at 217, 240 N.E.2d at 496 (emphasis supplied), suggests to us an error that pervades the climate of the proceedings be-

---

**3.** The objection to the court's self-defense instruction was raised by the defendant's appellate counsel in the Motion to Correct Errors and argued by him in the Appellant's Brief.

low, *viewed as a whole,* depriving the defendant of any realistic opportunity for a fair hearing."

*Winston, supra,* 332 N.E.2d at 232.[4]

"The second distinction relates to the function of the proper objection requirement. In the cases in which Indiana courts have found "fundamental error", the error involved the mistake or misconduct of the trial judge in the exercise of his own affirmative duties...."

*Winston, supra,* 339 N.E.2d at 233.[5]

This case fails to fall within either distinction. Indeed, a review of recent cases demonstrates that it does not fall within the first distinction. In *Harris v. State* (1978), 268 Ind. 594, 377 N.E.2d 632, our Supreme Court held that the failure to tender an instruction or to object to the trial court's failure to give an instruction on self-defense—although such an instruction would have been appropriate under the evidence—waived any error in the trial court's failure to give such an instruction. *Id.,* 377 N.E.2d at 634.

A fundamental error claim was also rejected where the trial court did not give, *sua sponte,* an instruction on lesser included offenses, although an instruction was warranted by the evidence. *Helton v. State* (1980), 273 Ind. 211, 402 N.E.2d 1263, 1266. In *Miller v. State* (1977), 266 Ind. 461, 364 N.E.2d 129, 131, a less than perfect instruction upon the State's burden of proof was not fundamental error, notwithstanding that a proper instruction thereon was mandated by Indiana Rules of Procedure, Criminal Rule 8(F). And, in *McDonald v. State* (1976), 264 Ind. 477, 346 N.E.2d 569, *reh. denied,* it was held that there was no evidence to support a claimed omission from the trial court's instruction on self-defense, but, even if there had been, it was incumbent upon the defendant to request that the desired language be added

—either by a tendered instruction or by objection to the proposed instruction "sufficiently articulated to enlighten the trial court as to the theory relied upon." *Id.* 346 N.E.2d at 572. *See also Nelson v. State* (1980), 274 Ind. 218, 409 N.E.2d 637, 638–639, *reh. denied; modified on other grounds, Bailey v. State* (1985), Ind., 472 N.E.2d 1260.

Furthermore, this case does not fall within the second distinction. In *Grimes v. State* (1976), 170 Ind.App. 525, 353 N.E.2d 500, *reh. denied,* the defendant contended that the trial court erred in not instructing the jury that assault and battery with intent to gratify sexual desires is a lesser included offense of the crime of statutory rape. There was evidence to support such an instruction, but the defendant did not object at trial to the instruction given on lesser included offenses and he did not tender any instructions.

On appeal, Grimes contended that the waiver doctrine was inapplicable. He contended that the trial court, in charging the jury, had a duty to state all matters necessary for the jury's information in giving its verdict. Thus, he said that the burden of deciding when an instruction on a lesser included offense should be given is not exclusively on the defendant.

However, the Court stated:

It is true that the trial judge has a duty, in charging the jury, to "state to them all matters of law which are necessary for their information in giving their verdict." IC 1971, 35-1-35-1 (Burns Code Ed.). The performance of this duty requires some discretion on the part of the trial court. [Citations omitted.] *Clearly, an error on the part of the trial judge in instructing the jury is likely to be corrected if the defense counsel informs the judge of his objections.* The policy

---

**4.** Cases cited in *Winston* as falling within this category include *Ford v. State* (1967), 248 Ind. 438, 229 N.E.2d 634 (trial judge improperly induced defendant to waive trial by jury); and *Wilson v. State* (1943), 222 Ind. 63, 51 N.E.2d 848 (incompetent representation plus prejudicial remarks by trial judge).

**5.** *Winston* cites the following cases as falling within this second category: *Branan v. State* (1974), 161 Ind.App. 443, 316 N.E.2d 406, *trans. denied* (trial judge failed to insure that defendant's guilty plea was knowing and voluntary); *Young v. State* (1967), 249 Ind. 286, 231 N.E.2d 797 (sentence imposed for offense not charged); *Ford, supra;* and *Wilson, supra.*

requiring timely and specific objections to jury instructions is one which weighs heavily against invocation of the fundamental error doctrine. The very purpose of the specific objection rule is "to indicate specific errors in the trial court's instructions so that the court may have an opportunity to make any necessary corrections in order to avoid a new trial." [Citations omitted.] (Emphasis added.) *Id.*, 353 N.E.2d at 508. *See* Indiana Rules of Procedure, Criminal Rule 8(B).

Here, the error likely would have been corrected if it had been pointed out to the trial court. Based on the *Winston* considerations, we conclude that the error does not rise to the level of "fundamental error." *See Grimes, supra.*

## II.

### *Speedy Trial*

The Information in this case was filed on October 17, 1985. On December 18, 1985, the case was set for trial on March 13 and 14, 1986. The State made a motion for continuance which was granted on March 3, 1986. On March 10, 1986, the trial was reset for July 10 and 11, 1986, without objection; then, on July 7, 1986, the trial was scheduled for July 11, 1986, without objection. The defendant failed to appear on July 11, 1986; thus, the trial judge ordered the Bail Bond Commissioner to produce the defendant on July 14, 1986. On July 14, 1986, the trial was re-set for November 19 and 20, 1986,[6] without objection.

On November 3, 1986, both the State and defense counsel filed a joint motion for continuance, and the trial was scheduled for November 13, 1986. On November 14, 1986, the trial was continued to November 24, 1986, without objection. Finally, on November 24, 1986, the trial was continued to March 31, 1987, without objection.

6. Ind. Rules of Procedure, Criminal Rule 4(C) provides, in pertinent part:
   No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed....

The defendant now contends that the trial court should have discharged him *sua sponte* for violation of his constitutional right to a speedy trial.

■ However, the defendant has waived his argument for two reasons. First, we have held that a defendant has a duty to alert the trial court when the trial date has been set beyond the proscribed limits. *Thomas v. State* (1986), Ind., 491 N.E.2d 529, 531. If a defendant does not object to the trial date at his earliest opportunity he will be deemed to have acquiesced in the date. An objection must be lodged in time to permit the trial court to set the date within the one year period. *Id.*

Here, when the trial court, on July 14, 1986, re-set the trial date for November 19 and 20, 1986—putting the defendant's trial date more than one year beyond the date the criminal charge was filed—the defendant failed to object. If he had, the trial court would have had the opportunity to set the date within the one-year period.

Second, the defendant has not shown how he was prejudiced by the delay. Generally, prejudice is examined in the light of the interest of defendants which the speedy trial right was designed to protect. *Terry v. State* (1980), Ind.App., 400 N.E.2d 1158, 1160, *reh. denied.* Three such interests have been identified: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Id.* Here, the defendant was out on bond pending his trial. Further, he has made no showing of excessive anxiety or impairment to his defense. The burden is upon the defendant to show that he has actually been prejudiced by the delay. *Id.* at 1161. Thus, the defendant's speedy trial claim must fail.

Because the Information was filed on October 17, 1985, a trial date of November 19 and 20, 1986, put the trial more than one year beyond the date the criminal charge was filed.

## III.

### Rebuttal Evidence

During the State's cross-examination of the defendant, the defendant testified that, in the past, he had been threatened by Hobbs. In fact, he stated that three weeks prior to the stabbing, Hobbs had threatened to stop by the defendant's apartment to beat him up. As a result, the defendant asked Hobbs to fight in "an area that was patrolled by police...." When Hobbs refused, the defendant slashed the tires on his automobile so that Hobbs "couldn't come after" him.

After the defendant's case-in-chief, the State recalled Kenneth Angel as a rebuttal witness, over the defendant's objection. Angel then testified about the incident that occurred three weeks prior to the stabbing. According to Angel, who was present when the defendant asked Hobbs to fight, it was the defendant who was the aggressor. On three different occasions that night, he said, the defendant approached Hobbs, and each time, Hobbs refused to fight.

On appeal, the defendant contends that "the State cannot raise an issue in cross-examining an adverse party, then under the guise of rebuttal evidence, develop such evidence which could have been presented in its case-in-chief."

The scope of rebuttal evidence is a matter for the trial court's discretion; its decision will be disturbed only upon a showing of abuse of that discretion. *Berkley v. State* (1986), Ind., 501 N.E.2d 399, 400. Rebuttal evidence is limited to that which tends to explain, contradict, or disprove evidence offered by the adverse party. *Id.*

■ The defendant in *Berkley* advanced the same argument the defendant is advancing here. However, the Court rejected that argument, holding that when the accused attempts to prove a factual defense which justifies his actions, such as self-defense, the State may offer evidence to rebut that defense. *Id.* at 401. Indeed, evidence about prior acts which can be specifically connected to the offense at bar may be admitted. *Id. See also Martin v. State* (1987), Ind., 512 N.E.2d 850, 852, and *Ra-*

*mos v. State* (1982), Ind., 433 N.E.2d 757, 760, *reh. denied.*

Thus, the trial court did not abuse its discretion by allowing Angel's rebuttal testimony into evidence.

## IV.

### Photographs of Crime Scene

State's Exhibits 2 and 3 were admitted, without objection, during the direct examination of Kenneth Angel. Both of the exhibits are photographs of the parking lot outside Jay's Pantry as it appeared on October 11, 1985. Both photographs show a brown automobile and blood on the pavement.

Later, during the State's direct examination of Officer York, the trial court permitted the officer to testify using the photographs, over the defendant's objection.

The defendant now contends that the trial court committed error in that discussion or testimony concerning photographs as demonstrative evidence should not be permitted after they have been admitted into evidence; the defendant contends that such evidence speaks for itself and is a factual determination to be made by the jury regarding interpretation and relevance.

■ However, in *Swope v. State* (1975), 263 Ind. 148, 325 N.E.2d 193, *cert. denied,* 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100, such an argument was rejected by the Indiana Supreme Court. There, the Court stated:

> There is no reason that admissible slides may not be viewed by the jury several times, if on each occasion, the slides are relevant to the witness' testimony. Historically, photographs were admissible only as graphic portrayals of oral testimony.

*Id.,* 325 N.E.2d at 200.

Here, Officer York's testimony concerned his observations of the crime scene immediately after the stabbing. He used the photographs to help illustrate his testimony and show where the victim was located. Thus, the photographs were relevant

to his testimony, and the defendant's argument must fail.

## V.

### Character Evidence

The defendant contends that the trial court erred by permitting the State to cross-examine him regarding his relationship with the victim. He claims that this was improper evidence used to impeach his character.

■ We disagree. In its cross-examination of the defendant, the State elicited testimony which included alleged threats made against the defendant by the victim and an argument and near fight at the same bar where the later stabbing occurred. This constituted evidence of a motive for killing the victim. And, it is well settled that evidence of motive is entirely admissible and probative on the issue of the defendant's guilt. *Biggerstaff v. State* (1982), Ind., 432 N.E.2d 34, 36.

## VI.

### Hypothetical Question

The State's examination of Dr. Peter Casey, a pathologist, included the following:

Q. Doctor Casey, I have Danny Hobbs, still alive down here, (gesturing) and I was bent over him like this, I made a swinging motion like this, could that one time, could that have ... with a weapon such as I showed you, could that have inflicted the fatal wound?

MR. SNYDER: Your Honor, I'm going to object. There's no basis to the evidence.

MR. MUSSER: He was asking the direction with which the blows ...

MR. SNYDER: There's no evidence before court, he could have been standing up just as well as laying down.

\* \* \* \* \* \*

COURT: I'll overrule the objection.

A. Yes it could, from the best of my knowledge of the placement of the wound, the way the ... the direction of the wound, it could have been.

Record at 324.

The defendant now contends that the trial court erred by permitting Dr. Casey to testify as to how the fatal injury might have been inflicted. He claims that Dr. Casey's opinion was not based upon facts in evidence, that his opinion was an improper opinion on an ultimate issue, and that Dr. Casey was not qualified to render such an opinion.

At trial, the defendant only objected that there was no evidence supporting the implication in the question that Danny Hobbs was laying down rather than standing up. Thus, he has waived any error predicated on the other two contentions he has raised on appeal. *See Bedgood v. State* (1985), Ind., 477 N.E.2d 869, 872.

■ As for the argument he did preserve, it, too, must fail. Earlier, Robert Lesure testified:

"... I looked around and Kenneth Hoemig was on top of Danny Ray Hobbs ... and he was on top of him, kind of crouched over and I thought I saw him smack him ... Kenneth went to get up and I saw him put something in his back pocket. *At that time*, Danny Ray Hobbs stood up...." (Emphasis added.)

Record at 252.

Thus, there was evidence to support the implication that Danny Ray Hobbs was laying down at some point during the altercation.

## VII.

### Autopsy Photographs

The defendant contends that the trial court erred by admitting State's Exhibits 4, 5, 6, and 7 into evidence. All four exhibits were photographs taken of the decedent post-mortem. The defendant contends that the photographs were irrelevant given that the cause of death and the individual responsible for that death were never at issue. However, the defendant admits that no objection was raised at trial when the photographs were offered into evidence. The failure to raise a timely and specific

objection at trial constitutes a waiver of any error on appeal. *Bedgood, supra.*

## VIII.

### *Sustaining Objection*

The defendant contends that the trial court erred when it sustained an objection by the State which did not specify the grounds for the objection.

The defendant's cross-examination of Dr. Alan McGee included the following:

Q. Doctor McGee, do you remember after the person you were working on ... well, strike that. Do you remember at some point and time during the course of administering to your patient, leaving your patient and coming out into the hall and talking to a police officer by the name of Cummins and taking to him this exhibit that's been identified as exhibit eight?

A. I cannot tell you the officer's name.

Q. Do you remember coming out?

A. I remember coming out with with that object, yes.

Q. Do you remember that conversation?

A. No, I don't. To be honest with you.

Q. If the police officer's notes indicated that you told him that the knife was taken from your patient's right pocket and the blade was open—

MR. MUSSER: Objection, Your Honor.

COURT: Objection sustained.

Record at 279.

■ The defendant's contention must fail for two reasons. First, specific objections are required, but only to preserve an alleged error for appellate review. *See Bedgood.* Second, reversible error cannot be based upon a ruling which is sustainable upon any basis. *Moritz v. State* (1984), Ind.App., 465 N.E.2d 748, 755, *trans. denied.* Here, defense counsel appeared to be attempting to refresh the doctor's memory by referring to the police officer's notes. Testimony concerning the substance of the police officer's notes could only come from the police officer.

## IX.

### *Final Argument*

The defendant contends that the trial court erred by permitting improper final argument by the prosecutor. He contends that the prosecutor shifted the burden of proof issue to him.

The prosecutor stated:

"... I've argued and I am telling you to please consider that he intentionally took Danny Hobbs' life and that he had an option, and when you hear that instruction on he has a duty to back off if he has the opportunity, that's what the instruction says. That's one of the qualifications, he has a duty to back off if he can. And even by his own version of this incident, he had nothing to do but back up and walk in that door.

MR. SNYDER: Your Honor I'm afraid I'm going to have to impose an objection. That is not the law in the State of Indiana, and I think the Prosecutor is mis-stating the—

COURT: Well, the Court will instruct the jury.

MR. SNYDER: For him to continue arguing that he has a duty I think is improper and would ask the Court to—

COURT: Mr. Musser, you may wind up your argument.

Record at 437.

The defendant's contention must fail. While he objected to the prosecutor's comments at trial, he did not request an admonishment and mistrial. Thus, he waived the alleged error. *Dresser v. State* (1983), Ind., 454 N.E.2d 406, 407–408, *reh. denied.*

■ Even had the defendant preserved the alleged error, the prosecutor's comments were a correct statement of Indiana law. When a defendant has entered into combat with another person or is the initial aggressor, there is a duty to withdraw from the altercation, if possible, and the defense of self-defense is not available to one who does not so withdraw. *See* IC 35-41-3-2(d)(3).

## X.

### *Sufficiency of Evidence*

The defendant contends that there is insufficient evidence to support his conviction for voluntary manslaughter.

Where the sufficiency of evidence is challenged on review, this Court will neither weigh the evidence nor determine the credibility of witnesses, but rather will look to evidence most favorable to the State together with all reasonable inferences therefrom. We will then determine if there is substantial evidence of probative value from which the trier of fact might reasonably infer guilt beyond a reasonable doubt. *Harris v. State* (1985), Ind., 480 N.E.2d 932, 937.

At trial, the defendant did not dispute that he stabbed Hobbs and that Hobbs died as a result. He relied upon the defense of self-defense. A valid claim of self-defense is legal justification for an otherwise criminal act. *Martin, supra,* 512 N.E.2d at 851.

To prevail on a claim of self-defense in a homicide prosecution, the defendant must show that he was in a place where he had a right to be, that he acted without fault, and that he had a reasonable fear of death or great bodily harm. *Id.* Once the defendant raises the issue of self-defense, the State bears the burden of disproving the existence of one of the elements of self-defense. *Id.* Among the ways this burden can be met is to present evidence sufficient to convince a reasonable juror beyond a reasonable doubt that the defendant, in light of all the circumstances known to him, used unreasonable force against another person to protect himself. *See id.*

Here, the evidence most favorable to the verdict showed that the defendant and Hobbs became involved in a fight. Witness Robert Lesure saw the defendant on top of Hobbs; the defendant was crouched over Hobbs and the defendant smacked him. Hobbs struggled to stand up, threatened to injure the defendant, but then discovered he was seriously injured. Hobbs later died.

The defendant testified that from looking at Hobbs, he could tell from his expression that Hobbs was going to kill him. However, no other witness observed such an expression. The jury was free to disbelieve the defendant's version of the incident and conclude that he used unreasonable force to protect himself. Thus, there was sufficient evidence to convict the defendant of voluntary manslaughter.

Affirmed.

GARRARD, P.J., and NEAL, J., concur.